**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 17 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BOBBY JOE FIELDS,

     Petitioner-Appellant,

v.

GARY L. GIBSON, Warden,
Oklahoma State Penitentiary,

     Respondent-Appellee.

No. 00-6145

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-98-25-T)**

---

James W. Berry of James W. Berry, P.C., Oklahoma City, Oklahoma, for
Petitioner-Appellant.

Seth S. Branham, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for
Respondent-Appellee.

---

Before **TACHA**, Chief Judge, **EBEL** and **LUCERO**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Bobby Joe Fields appeals the denial of his writ of habeas corpus brought under 28 U.S.C. § 2254. A certificate of appealability was granted on the following four issues: (1) whether trial counsels' pressure of Fields to accept a blind guilty plea resulted in its being involuntary; (2) whether trial counsel rendered ineffective assistance in advising Fields to enter a blind guilty plea; (3) whether the same evidence may support different death penalty aggravators; and (4) whether there was sufficient evidence to support the "prior violent felony" aggravator. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## BACKGROUND

A. <u>The Murder</u>

On March 1, 1993, Shirley Masterson, Bobby Joe Fields's girlfriend, invited Fields to party at her duplex at 1312 N. Indiana Avenue. Masterson's Aid to Families with Dependent Children check had arrived and she planned on using the money to buy alcohol and cocaine. Shawanda and Yolanda Pittman, Masterson's grown daughters, and Dia Russell, Shawanda and Yolanda's friend, were partying with Masterson and Fields.

The party continued the next day, March 2, 1993. Sometime around noon, Fields walked two doors down to Louise Schem's house (1324 N. Indiana Ave.) ostensibly to ask if he could do yard work for her. She declined. In the mid- to

- 2 -

late-afternoon, Fields went to the upstairs-half of Masterson's duplex (1312 ½ N. Indiana Ave.) to ask Albert Anuario if he wanted to buy a television and VCR for $70. Anuario, who had also been drinking, replied that he was interested but that he did not have enough money.

Fields decided to steal Schem's television and sell it to buy more cocaine. When, around 5 p.m., he again walked down the block to carry out the robbery, he thought Schem was not at home. He opened the screen door, pushed open the front door,[1] crossed the living room to the television (which was on), and reached to unplug it. At that moment, Schem entered the room carrying her .25 semi-automatic pistol. A struggle ensued as the two of them wrestled to control the gun. Despite the fact that, at the time, Fields was thirty years-old, 5' 7" tall, and weighed 140 pounds while Schem was elderly,[2] 5' 4" tall, and 114 pounds, their struggle was protracted: it began in the living room, spilled out the front door and down the steps, and ended on the sidewalk in front of Schem's house.[3]

Robert Vallejo happened to be driving by and saw the final seconds of the altercation. He testified that he saw them struggling on the sidewalk, heard

_____

[1]The record is ambiguous as to whether the front door was closed (and thus he had to open it) or whether it was ajar (and so he only had to push it open). We find the ambiguity irrelevant.

[2]A friend of Schem's testified she was "gaining on eighty."

[3]Schem's friend described her as "feisty" and "a fighter." (Tr. at 45.)

Schem cry "Help! Help!", heard a gunshot, and watched Schem fall to the sidewalk. The government's medical examiner testified that the bullet had a flat trajectory – it entered the back, left-side of Schem's neck, beneath her left ear, passed through her spinal cord and the back of her mouth, and exited her mouth, fracturing two of her incisor teeth. The gunpowder residue on the back of her neck indicated that the shot was fired from six to twelve inches.[4]

Vallejo drove away a short distance, made a U-turn, and returned to the scene. Fields had fled, but he returned to Masterson's house thirty to forty minutes later. As he walked in Masterson's back door, the pistol went off. Dia Russell testified that Fields looked hysterical – he was talking fast and breathing heavily. Perhaps half an hour after returning to Masterson's house, he went upstairs and sold the gun to Anuario for $40.

Shortly after the police and medical personnel started arriving at Schem's house, Russell took Masterson and Fields to Fields's sister's house. Russell testified that during the drive Fields said that "he didn't have any kind of remorse or guilt" and "he wouldn't lose any sleep" because "white people deserve what they got." (Fields is black; Schem was white.) In addition, she testified that

---

[4]While Fields testified that the pistol accidentally went off as he wrested it from Schem's hand, this evidence was also consistent with the government's theory and with other evidence that Fields wrenched the gun from Schem and, as she ran away, deliberately shot her.

later, while they were watching a news story of how the police had arrested a different black man for the murder, he said that he was "relieved" that he might not get caught and that "he had thought about being on [the television show] America's [M]ost [W]anted."

## B. Fields's Arrest and Guilty Plea

Two days after the murder, on March 4, 1993, Fields was arrested and interrogated.[5]  He told the police that, thinking Schem was not home, he went to her house to steal her television.  When she surprised him with a gun, he jumped at her in self-defense, and they wrestled over the weapon.  The struggle spilled out onto the sidewalk, where he pulled the gun from her hands.  As he did so, it went off accidentally, killing her.

Fields was charged with first degree felony murder, and, in the alternative, first degree malice murder.  On May 7, 1993, a Bill of Particulars was filed alleging three death penalty aggravators: that Fields previously had been convicted of a felony involving the use or threat of violence ("prior violent felony"); that Fields committed murder to avoid lawful arrest or prosecution

---

[5]The police detective who questioned Fields, Johnny Kuhlman, estimated that Fields told "at least five" different versions of what happened on the evening of March 2.  Fields eventually stuck with the following story, related in the text.

("murdered to avoid arrest"); and that Fields was a continuing threat to society ("continuing threat to society").

Catherine Burton, an assistant public defender, was assigned Fields's case on March 24, 1993. Burton was a relatively new attorney in the Public Defender's Office ("PDO"), having been there only 2½ years. Up until five days before trial, Burton was handling the case by herself. Her repeated requests for help did not elicit a response from the PDO. Burton was intimidated by the fact that the lead prosecutor in the case was Robert ("Bob") H. Macy.

Originally, Oklahoma Judge James Gullet had set trial for October 4, 1993. Burton asked for a continuance so she could better prepare, and the trial was reset for Monday, February 7, 1994. On Wednesday, February 2, 1994, Tim Wilson, assistant public defender and chief of the PDO's litigation division, the second most experienced death penalty lawyer at the PDO, overheard in the lunch room that Burton was going to trial by herself on the Fields case. He sought Burton out and volunteered his help. She accepted, they talked over the "pleadability" of the case, and she asked him to argue the motions.

Burton thought she had a "done deal" with Judge Gullet: she would convince Fields to accept a blind plea and he would be sentenced to less than death. Burton drew this conclusion from various conversations with Judge Gullet. For example, at a pretrial conference, after hearing the prosecutor recite the facts,

Judge Gullet said it did not sound like a death penalty case to him. At another time, Burton was speaking ex parte with Judge Gullet about another case, when he asked her to refresh him on the facts of the Fields case. After she did, he said, "If the facts are as you say they are, I will very, very, very, seriously consider giving him life or life without parole." During that same conversation, he told her he was retiring. Burton took that statement to mean that the judge was indicating that he was more inclined to sentence Fields to less than death because the judge would not have to answer to the media or worry about re-election.

Everyone agreed, however, that Judge Gullet never promised or guaranteed anything to Burton or Fields. Judge Gullet stated on the record that "not once did I advise [Burton] that I would consider one sentencing over another sentencing. Every time that she talked with this Court, what I would advise her, I would consider all three statutory ranges of punishment[: life, life without parole, and death]."

Burton relayed her impressions to Fields. She tried to convince him to enter a blind plea of guilty, but he was reluctant. She drew a line on her legal pad, six inches long, and marked off what she though his chances were of receiving each of the three possible punishments from Judge Gullet: his chance of getting death was half an inch, his chance of getting life was one inch, and his chance of getting life without parole was everything else – 4½ inches. She also advised

Fields that if he went to trial before a jury she believed that he would get the death penalty, and that tactically he would be far better off entering a blind guilty plea to the court. At the hearing on the motion to withdraw the plea, Burton testified that the week before trial she "pulled out all the stops" to convince Fields to accept the blind plea. She persuaded all of Fields's sisters, including the one who raised him, to try to convince him to enter a blind guilty plea. On Sunday, February 6, 1994, the day before trial, Burton and Wilson visited Fields and she told him that while she was fully prepared to go to trial, they both recommended that he take the blind plea because it was his best chance to avoid a death sentence. Finally they convinced him, and on Monday, February 7, 1994, Fields entered the blind guilty plea in open court. Prior to entering his plea, both his trial counsel (Burton and Wilson) and Judge Gullet told Fields that if he pled guilty, he could be sentenced to life, life without parole, or death.

The sentencing hearing took place March 28 - 29, 1994. The State and the defense each put on ten witnesses. Fields testified and was cross-examined. To demonstrate the "prior violent felony" aggravator, the government called Police Detective Robert Cannon. Cannon testified that on March 20, 1986, Fields had snatched a purse from a 58-year-old woman who was walking through a parking lot with her daughter. The daughter chased and caught Fields, who, in breaking free of her grasp, threw her to the ground. The government then introduced,

without objection, a certified judgment and sentence stating Fields was convicted of first degree robbery.

In mitigation, the defense showed that Fields's father physically abused his mother, his mother died when he was three years old, his oldest sister raised him in a loving family, he lived in a violent neighborhood, he abused alcohol since age eight, he used drugs since age nine, and he had been addicted to alcohol and cocaine for about twenty years. Dr. Phillip Murphy, a clinical psychologist, testified that Fields is somewhat anxious and agitated, feels tension when faced with anger, and has a propensity to panic in stressful situations. He stated that Fields has a balanced personality and a slightly below normal ("dull-average") I.Q. In his opinion, Fields had his emotional needs met by the loving, tight-knit family in which he was raised, and would not be a continuing threat to society.

After closing arguments, Judge Gullet took a thirty-minute recess to consider the evidence and make a decision. He found that the State had proven the existence of all three aggravating circumstances ((1) "prior violent felony," (2) "murdered to avoid arrest," and (3) "continuing threat to society") and that these aggravators "far outweigh[ed] any mitigating circumstances." Thus, he sentenced Fields to death by lethal injection. The court's final pronouncement of its death sentence took place one week later, on April 7, 1994.

C. Fields's Appeals

Fields timely filed a motion to withdraw his plea on April 15, 1994. On May 13, 1994, Judge Gullet held a hearing on this motion, at which Burton and Wilson testified.

When asked whether she "forced" Fields to plead guilty, Burton replied, "No, I just think I misinformed him. I think I misinterpreted and I misinformed my client." She reluctantly admitted that her advice to Fields was a tactical decision, based on her belief that he had a better chance of avoiding the death penalty if he pled guilty. When Wilson was asked whether Fields pled voluntarily, he said, "We told Mr. Fields that the best way to beat the death penalty was to blind plea. That we thought we had a wink and a nod. Armed with that, Mr. Fields, yes, he knowingly and voluntarily entered his plea." Wilson testified that they "strongly urged" Fields to accept the blind plea but that they made it clear it was "his decision."

Judge Gullet denied the motion to withdraw the plea, stating, "As far as I'm concerned this defendant took his chances. . . . I think the defendant was – entered this plea knowingly and voluntarily, and he was adequately represented by counsel."

Fields appealed directly to the Oklahoma Court of Criminal Appeals ("OCCA"), raising fifteen issues, including the four presented to us. See Fields v.

State of Oklahoma, 923 P.2d 624, 627-28 (Okla. Crim. App. 1996) (hereinafter, "Fields I"). In a published opinion dated July 31, 1996, the OCCA found no errors warranting reversal and affirmed the death sentence. See id. at 638. On June 9, 1997, Fields filed for state post-conviction relief, raising seven issues, and this, too, was denied by the OCCA. See Fields v. State of Oklahoma, 946 P.2d 266, 273 (Okla. Crim. App. 1997) (hereinafter, "Fields II").

Fields raised thirteen issues in his petition for federal habeas relief, including the four presented to us. In a 52-page Memorandum Opinion, Judge Thompson denied Fields's petition and motion for an evidentiary hearing. Notwithstanding his Memorandum Opinion, however, Judge Thomson granted a certificate of appealability ("COA") on two issues: (1) whether Fields's guilty plea was voluntarily entered due to his trial counsels' coercion, and (2) whether insufficient evidence supported the prior violent felony aggravator.

This court granted COA on two additional issues: (3) whether Fields was denied adequate representation of trial counsel when deciding to enter a blind plea of guilty, and (4) whether the same evidence can be used to support different aggravators in the penalty phase without violating the United States Constitution.

**DISCUSSION**

Bobby Joe Fields is a drug addict who, in order to feed his addiction, tried to steal a television from a house he arguably thought was empty. At the time of the attempted theft, he was drunk and probably high and was not carrying a weapon. Loiuse Schem surprised him, brandishing her .25 mm pistol. After a struggle during which he got control of the gun, he shot her once through the back of the neck and head, killing her instantly. He then fled. There was evidence that the gun may have had a hair-trigger because it discharged again as he re-entered Masterson's house half-an-hour after the murder. Fields's prior convictions were for first degree robbery – for snatching an elderly woman's purse – and for unauthorized use of a motor vehicle. Although in many ways this looks like just a burglary gone bad, Bob Macy, the prosecutor, chose to pursue the death penalty.

Because we do not find any reversible error, we affirm Fields's conviction and sentence.

A. <u>Standard of Review</u>

> Under the [Antiterrorism and Effective Death Penalty Act of 1996], our review of the state court's proceedings is quite limited . . . . We may not grant habeas relief unless the state court's decision was: "(1) ... contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Rogers v. Gibson, 173 F.3d 1278, 1282 (10th Cir. 1999) (quoting 28 U.S.C. § 2254(d)).  Factual findings of a state court are presumed correct and can be overturned by this Court only by a showing of clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

## I. Did Fields voluntarily enter his guilty plea?

Fields raised this issue to the OCCA, alleging that he was misinformed of his chances of receiving the death penalty if he accepted the blind plea and that Burton assumed that the trial judge had assured her that he would not sentence Fields to death. See Fields I, 923 P.2d at 632.  The OCCA found the facts were to the contrary.  "We find nothing in the record to indicate [Fields] and defense counsel were not fully aware that the death penalty was a possibility upon entering a plea. . . . The record reveals no promises of leniency, threats or coercion as the catalyst for [Fields's] entry of a blind plea . . . ." Id.  "Likewise, there is nothing in the record supporting defense counsels' claims that they thought they 'had a wink and a nod' from the judge indicating [Fields] would not receive the death penalty if he entered a plea." Id.  Thus, the OCCA concluded that "[d]espite his protestations to the contrary, there is . . . nothing to indicate that [Fields] did not knowingly and voluntarily, albeit with some anxiety, enter the guilty plea." Fields I, 923 P.2d at 634.

Whether a plea is voluntary is a question of federal law, but this legal conclusion rests on factual findings and inferences from those findings. See Parke v. Raley, 506 U.S. 20, 35 (1992) (pre-AEDPA case). Fields has not demonstrated a violation of AEDPA because he has failed to show that the OCCA's conclusion that he entered his plea voluntarily "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court . . . or . . . was based on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254(d).

The Due Process Clause of the Fourteenth Amendment requires that a defendant knowingly and voluntarily enter a plea of guilty. See Boykin v. Alabama, 395 U.S. 238, 242 (1969); Miles, 61 F.3d at 1465. "A plea can be involuntary even if the threats or promises do not come from a person within the criminal justice system." 5 Wayne R. LaFave, et al., Criminal Procedure § 21.4(b), at 157 n.33 (2d ed. 1999). "Acts that might constitute coercion if done by the court or a prosecutor may not rise to that level if done by others." Iaea v. Sunn, 800 F.2d 861, 867 (9th Cir. 1986) (citing United States ex rel. Brown v. LaVallee, 424 F.2d 457, 461 (2d Cir. 1970) (explaining that statements that might have been coercive when made by a prosecutor or judge are not coercive when

- 14 -

made by defendant's mother and his counsel)).[6] "[C]oercion by the accused's counsel can render a plea involuntary." United States v. Estrada, 849 F.2d 1304, 1306 (10th Cir. 1988).

"The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Hill v. Lockhart, 474 U.S. 52, 56 (1985) (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970). "A plea may be involuntary when an attorney materially misinforms the defendant of the consequences of the plea," United States v. Rhodes, 913 F.2d 839, 843 (10th

---

[6] This court in dicta previously has suggested that only coercion by the State can render a plea involuntary: "We also note that Petitioner's family's urgings do not implicate the due process clause of the Fourteenth Amendment because the influence did not come from the court or the government." Miles, 61 F.3d at 1470. However, this dicta is contrary to our earlier holdings in Laycock v. State of New Mexico, 880 F.2d 1184, 1186 (10th Cir. 1989); United States v. Estrada, 849 F.2d 1304, 1306 (10th Cir. 1988); and Wellnitz v. Page, 420 F.2d 935, 936 (10th Cir. 1970). Cf. United States v. Wilson, 922 F.2d 1336, 1340-41 (7th Cir. 1991); Bostic v. Carlson, 884 F.2d 1267, 1272 (9th Cir. 1989); Iaea v. Sunn, 800 F.2d 861, 866-67 (9th Cir. 1986). But cf. LoConte v. Dugger, 847 F.2d 745, 753 (11th Cir. 1988). As dicta inconsistent with prior Tenth Circuit law, we are not bound by it. See United States v. Neal, 249 F.3d 1251, 1258 (10th Cir. 2001).

The Supreme Court expressly has held that the actions of defense counsel (who are not state actors, see Polk County v. Dodson, 454 U.S. 312, 321-22 (1981)) may render a plea involuntary and thus a violation of due process. Hill, 474 U.S. at 56. The state-action rationale supporting the holding in Hill appears to be that state action arises from the sentencing court's enforcement of the agreement and/or the state's holding of the prisoner in custody as a result of the plea. See Wilson, 922 F.2d at 1341 ("The result of enforcing the plea bargain is that a defendant is put in custody, and that assuredly entails state action.").

Cir. 1990),  e.g., by falsely alleging that promises or guarantees exist, see Braun v. Ward, 190 F.3d 1181, 1189 (10th Cir. 1999) (finding a guilty plea voluntary because the defendant was "taking his chances" by relying on his attorney's good-faith advice and there was no evidence of guarantees or promises).  In addition, a plea may be involuntary if counsel informs the defendant that he has no choice, he must plead guilty. See United States v. Carr, 80 F.3d 413, 416 (10th Cir.1996) (stating that, to be valid, a plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant") (emphasis added). Fields was neither materially misinformed nor told he had no choice.

The two potential sources of coercion in this case are his trial counsel and his family.  As for trial counsel, although Burton and Wilson "pulled out all the stops" and "strongly urged" Fields to accept the blind guilty plea, they never told him they had a promise or guarantee that by pleading guilty he would not receive a death sentence.  They couched their advice in terms of probabilities, e.g., Burton's line-diagram that, based on her assessment of Judge Gullet's statements and actions, he was far more likely to sentence Fields to less than death if he pled guilty.  "An erroneous sentence estimate by defense counsel does not render a plea involuntary.  And a defendant's erroneous expectation, based on his attorney's erroneous estimate, likewise does not render a plea involuntary."

Wellnitz v. Page, 420 F.2d 935, 936-37 (10th Cir. 1970) (internal citations omitted). The Supreme Court explained,

> Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.
> That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing.

McMann v. Richardson, 397 U.S. 759, 770 (1970).

In a prior case, this court found a guilty plea voluntary despite trial counsel's "vigorous[] urg[ing]" that his client plead guilty because the attorney believed it was in his client's best interest. See Miles, 61 F.3d at 1470. Indeed, one central component of a lawyer's job is to assimilate and synthesize information from numerous sources and then advise clients about what is perceived to be in their best interests. "'Advice – even strong urging' by counsel does not invalidate a guilty plea." Williams v. Chrans, 945 F.2d 926, 933 (7th Cir. 1991) (quoting Lunz v. Henderson, 533 F.2d 1322, 1327 (2d Cir. 1976)); accord Carr, 80 F.3d at 416.

Furthermore, the trial court advised Fields at the change-of-plea hearing that he could be sentenced to life, life without parole, or death. This colloquy between a judge and a defendant before accepting a guilty plea is not pro forma and without legal significance. Rather, it is an important safeguard that protects

- 17 -

defendants from incompetent counsel or misunderstandings. At these colloquies, judges take the time to insure that defendants understand the consequences of a guilty plea. See Hardzog v. State, 293 P. 1107, 1108 (Okla. Crim. App. 1930) (stating that a guilty plea "should not be accepted until after the defendant has been fully advised by the court of his rights and the consequences of his plea"); cf. Fed. R. Crim. P. 11(c) (entitled "Advice to Defendant" and requiring that a court address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, inter alia, the nature of the charge and the maximum possible penalty provided by law). Had Fields misunderstood or been misinformed about the possibility of receiving the death penalty, Judge Gullet's discussion would have alerted Fields to that fact.

The claim that Fields's family coerced him also fails. While Burton convinced Fields's family to implore him to plead guilty, Fields never alleges that his family members forced or threatened him. By comparison, in Miles, the defendant's family "urged him to plead [guilty] so that they would not have to go to prison." Miles, 61 F.3d at 1469. Yet even there this court upheld the district court's determination that "although Petitioner's family urged him to enter the plea, they did not force, threaten, or coerce him to do so." Id.

For the foregoing reasons, we determine that there was no violation of AEDPA. Fields has not demonstrated that the OCCA's conclusion that he entered

his blind guilty plea voluntarily "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court . . . or . . . was based on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254(d).[7]

## II. Did trial counsel render ineffective assistance in advising Fields to enter a blind guilty plea?

"Claims of ineffective assistance of counsel involve mixed questions of law and fact for purposes of review under § 2254." Gonzales v. McKune, 247 F.3d 1066, 1072 (10th Cir. 2001) (citing Williams v. Taylor, 529 U.S. 362, 402-03 (2000) (reviewing question of prejudice in ineffective assistance of counsel claim under § 2254(d)(1))), reh'g en banc granted on other grounds, No. 00-3003

---

[7]Fields contends that (1) Burton was young and inexperienced and (2) he "is not very intelligent and [] suffers from panic disorders." See Opening Brief at 16-18. However, with regard to Burton's inexperience, "we cannot hold that lack of experience is the equivalent of incompetence for competent defense may be accomplished by inexperienced counsel." United States v. Helwig, 159 F.2d 616, 617-18 (3d Cir. 1947). Absent a finding of incompetence, evidence regarding Fields's below-average intelligence does not establish that the guilty plea was involuntary. See Dusky v. United States, 362 U.S. 402, 402 (1960) (the test of mental competency at the time of trial or the entering of a plea in a criminal case is whether the accused "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him."); Wolf v. United States, 430 F.2d 443, 445 (10th Cir. 1970) ("The presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to knowingly and voluntarily enter a plea as well as aid and assist in his own defense."). None of these factors, separately or considered together, establish that Fields's guilty plea was involuntary.

(10th Cir. June 18, 2001). "If a state court did not hear the petitioner's claims on the merits, however, we review the district court's legal conclusions de novo and its findings of fact, if any, for clear error." Id.

"The Supreme Court has set forth a two-part test for evaluating the claim of a habeas petitioner who is challenging his guilty plea on the ground that he was denied his Sixth Amendment right to effective assistance of counsel." Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir. 1998). First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Hill v. Lockhart, 474 U.S. 52, 57 (1985). "To prove deficient performance, [Fields] must overcome the presumption that counsel's conduct was constitutionally effective. . . . For counsel's performance to be constitutionally ineffective, it must have been completely unreasonable, not merely wrong." Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999).

Second, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59. When assessing "prejudice," a court may consider the likelihood that the correction of an alleged error "would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part

on a prediction whether the [error] likely would have changed the outcome of a trial." Id. See Miller v. Champion, 262 F.3d 1066, 1073 (10th Cir. 2001).

"We may address the performance and prejudice components in any order, but need not address both if [Fields] fails to make a sufficient showing of one." Boyd, 179 F.3d at 914.

Relevant to this appeal are three ways Fields alleges his trial attorneys' performance was constitutionally ineffective: (1) they coerced Fields into accepting the guilty plea, see Opening Brief at 21, 23; (2) they drew unwarranted conclusions from their conversations with Judge Gullet and the prosecutors, id. at 22-23; and (3) they failed to advise him that he was not guilty of either felony or malice murder, id. at 21, 23-27.[8]

The OCCA addressed the first two of these claims and found "nothing to support [Fields's] claim that counsel's performance was deficient." Fields I, 923 P.2d at 635. It reasoned, "The fact that the desired result was not reached in this case does not render defense counsel ineffective." Id. Fields first raised the third claim on federal habeas review, and the federal district court rejected it on two,

_____

[8]Fields also alleges (4) that his attorneys' investigation and presentation of mitigating evidence was deficient. This issue, however, is outside the scope of the issues on which a certificate of appealability was granted. "[A]ppellate review of the habeas denial is limited to the specified issues" in the certificate of appealability. Ramsey v. Bowersox, 149 F.3d 749, 759 (8th Cir. 1998); see 28 U.S.C. § 2253(c). Fields himself treated the two issues as distinct in his federal Petition for Writ of Habeas Corpus.

alternative grounds: (1) it was procedurally barred and no exceptions to the bar apply, and (2) "the claim itself lacks merit." Memorandum Opinion at 50.

1. Coercion

Fields admits that this argument is merely a re-statement of his argument from Issue One. See Opening Brief at 23 ("Fields would not have pleaded guilty, except for trial counsel's utilization of certain unacceptable tactics herein above discussed in Proposition I, above."). Since we concluded above that Burton and Wilson did not coerce Fields but merely "strongly urged" him to do what they thought was in his best interest, we find this argument fails to demonstrate deficient performance. Accordingly, the OCCA's determination that there was "nothing [in the record] to support [Fields's] claim that counsel's performance was deficient" was not "contrary to, or [did not] involve[] an unreasonable application of, clearly established Federal law as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

2. Unwarranted Conclusions from Conversations with the Judge

Fields argues that "[t]rial counsel's reliance upon these statements [by Judge Gullet and the district attorneys], as gospel, was deficient . . . ." Lawyers, like Burton, are supposed to draw conclusions from all the evidence in a case and recommend what they think is in their clients' best interest. That is precisely what Burton did, even if her conclusions were, in hindsight, unwarranted.

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Strickland v. Washington, 466 U.S. 668, 689 (1984) (quotations omitted). "The Supreme Court has recognized that because representation is an art and not a science, even the best criminal defense attorneys would not defend a particular client in the same way." Waters v. Thomas, 46 F.3d 1506, 1522 (11th Cir.1995) (en banc) (alterations, quotation marks, and citations omitted). Burton's performance was not completely unreasonable; therefore it was not deficient. See Boyd, 179 F.3d at 914 ("For counsel's performance to be constitutionally ineffective, it must have been completely unreasonable, not merely wrong.").

The facts in this case are strikingly similar to those in Braun v. Ward, 190 F.3d 1181 (10th Cir. 1999). In that case, Braun alleged that "his blind plea of nolo contendere was involuntary because it was induced by the ineffective assistance of trial counsel." Id. at 1188. Braun contended that "his attorneys misled him into entering his plea when they related to him an alleged conversation with the trial judge indicating that the judge was surprised the prosecutors were seeking the death penalty . . . and when they advised him that he

had a better shot in front of the judge than a jury of getting life without parole." Id. In addition, Braun complained about his attorneys' observation that "the judge was a veteran and would not feel the pressure" to give a death sentence. Id. at 1189. This court rejected his claim, writing, "Braun's attorneys made no guarantees regarding his sentence. Based upon their experience and expertise, they properly advised him that he had a better shot in front of the judge. . . . Moreover, it is clear Braun knew when he was entering his plea that he was taking his chances." Id. at 1190. We find no deficient performance in counsel's recommendations that Fields enter into a blind guilty plea based, in part, upon counsel's interpretation of the district judge's sentiments as expressed in ex parte communications.

At oral argument, Fields's counsel argued that Burton's representation was deficient because, in advising Fields, she had relied solely on ex parte discussions with Judge Gullet. We reject this argument for two reasons. First, it is counter-factual. Implicit in Burton's recommendation to Fields that he had a better chance of not receiving the death penalty from a judge than a jury was an assessment by Burton of the merits of the case. Second, while it might have been improper for Burton to have ex parte conversations with Judge Gullet, once they occurred she was under no duty to disregard what she had learned. Again, a lawyer is supposed to take all information she learns and use it to advise her

- 24 -

client of his best course of action.

Consequently, the OCCA's conclusion that Fields's counsels' performance was not deficient was not "contrary to, or [did not] involve[] an unreasonable application of, clearly established Federal law as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

### 3. Not Guilty of Murder

Fields argues that he was not guilty of burglary, so he could not have been guilty of felony murder. He reasons that he was not guilty of burglary because "there was not forcible entry [into Schem's home], [Fields] was unarmed and he [believed Schem] was not at home at the time of the break-in of her home." Id. The federal district court concluded (1) that this claim is procedurally barred, and (2) that Fields's own testimony establishes that he is guilty of burglary. See Memorandum Opinion at 30-32, 45-50. We need not review the district court's conclusion that this claim is procedurally barred because we can easily find it fails on the merits. See United States v. Wright, 43 F.3d 491, 496 (10th Cir. 1994) (rejecting claim under § 2255 on the merits, rather than on the alternative ground of procedural default).

Fields's contentions that he did not forcibly enter, that he was unarmed, and that he believed Schem was not home are not dispositive. "The essential elements of First Degree Burglary are (1) breaking, (2) entering, (3) a dwelling, (4) of

- 25 -

another, (5) in which a human is present, (6) with the intent to commit some crime therein." Calhoun v. State, 820 P.2d 819, 821 (Okla. Crim. App. 1991). "The word 'breaking' has been defined as 'any act of physical force, however slight, by which obstructions to entering are removed.'" Pack v. State, 819 P.2d 280, 283 (Okla. Crim. App. 1991). In Pack, the OCCA found that pushing a door that was already one to two feet open in order to gain entry qualified as "breaking." See id.; see also Dean v. State, 381 P.2d 178, 182 (Okla. Crim. App. 1963) (opening a closed door in order to enter a building constitutes "breaking"). While here it was ambiguous whether Schem's front door was closed or slightly ajar, Fields's action of opening the screen door, pushing open (or opening) the front door, and crossing the threshold into Schem's home satisfies the first two elements of "breaking" and "entering."

Finally, as the district court wrote, "There is no requirement that the defendant know someone is at home to commit First Degree Burglary. Rather, someone must be home." Memorandum Opinion at 49 (emphasis in original). It is undisputed that Schem was, in fact, at home when Fields entered with the intent to steal her television.

Thus, we find this argument without merit.

**III. Does using the same evidence to support different death penalty aggravators violate the federal Constitution?**

It is unclear whether, in this claim, Fields argues that the federal Constitution was violated because (1) the three aggravators in this case were duplicative or (2) the same evidence was used to support more than one aggravator. Either way, this claim fails on the merits.[9]

A. Duplicative Factors

"The constitutional validity of aggravating factors is a question of law subject to de novo review." United States v. McCullah, 76 F.3d 1087, 1107 (10th Cir. 1996). In McCullah, this court explained that the presence of "duplicative" aggravating factors results in weighing a factor twice, see id. at 1111-12, and "[s]uch double counting . . . has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." Id. at 1111. Accordingly, we held "that the use of duplicative

_____

[9]Arguably, neither of these two claims was presented to the OCCA. It addressed and rejected the question of whether Fields's sentencing was unfair because "the judge relied on the same evidence to support two different aggravators." Fields I, 923 P.2d at 637 (emphasis added). The federal district court did not discuss the possibility that these claims were procedurally barred, instead dismissing them on the merits. See Memorandum Opinion at 43-44. We likewise see no need to investigate procedural bar when the claims are so clearly meritless. See United States v. Wright, 43 F.3d 491, 496 (10th Cir. 1994) (rejecting claim under § 2255 on the merits, rather than on the alternative ground of procedural default).

aggravating factors creates an unconstitutional skewing of the weighing process which necessitates a reweighing of the aggravating and mitigating factors." Id. at 1112. To determine whether aggravating factors are duplicative "[t]he applicable test 'is not whether certain evidence is relevant to both aggravators, but rather, whether one aggravating circumstance necessarily subsumes the other[s].'" Smith v. Gibson, 197 F.3d 454, 464 (10th Cir. 1999) (quoting Cooks v. Ward, 165 F.3d 1283, 1289 (10th Cir. 1998)).

The three aggravating factors in this case – "prior violent felony," "murdered to avoid arrest," and "continuing threat to society" – are not duplicative because none of them "necessarily subsumes" the others. "Prior violent felony" requires that the government prove the defendant has committed, in his past, some violent felony which is unrelated to the crime for which he is being convicted. "Murdered to avoid arrest" requires that the government prove the defendant murdered someone in order to avoid lawful arrest or prosecution for the crime for which he is being convicted. "Continuing threat to society" requires that the government prove, based upon his prior conduct, the defendant will likely be a continuing threat to society in the future. The three aggravators are distinguishable on the basis of the time-frame and conduct necessary to prove their existence. While some of the same evidence may be relevant to proving the existence of each, none of them "necessarily subsumes" any of the others.

- 28 -

The evidence in this case supports this observation. To prove "prior violent felony" the government elicited testimony about a purse-snatching Fields committed in 1986. To prove "murdered to avoid arrest" the government introduced evidence that Fields killed Schem in order to avoid being identified by her. To prove "continuing threat to society" the government relied on the same evidence for the prior two aggravators plus other evidence, e.g., "that [Fields] was unemployed and an admitted crack addict" who "was prone to panic in stressful situations" and that Fields "left the scene of the murder, sold the victim's gun to an upstairs neighbor, and purchased additional drugs with that money before returning to his girlfriend's house, all within a short period of time." Fields I, 923 P.2d at 637. This evidence was used to demonstrate a likelihood that Fields would be dangerous in the future. None of the inquiries "necessarily subsumed" any of the others.

This court has explicitly found that "prior violent felony" and "continuing threat to society" are not duplicative: "[T]he aggravating circumstance of future dangerousness and prior felony conviction are not duplicative. The former is supported by evidence of the petitioner's potentiality for future dangerous acts, the latter by evidence of petitioner's past acts." Johnson v. Gibson, 169 F.3d 1239, 1252 (10th Cir. 1999) (citing Berget v. State, 824 P.2d 364 (Okla. Crim. App. 1991)). Berget explains the difference between "prior violent felony" and

"continuing threat to society":

> [T]he two aggravating circumstances are clearly individual, calling for unique determinations on the part of the jury. In one instance, the sentencer is called upon to evaluate evidence, the judgments and sentences, which indicate the defendant's prior history of criminal activity. In the second instance, the court must look at evidence, including the circumstances of the defendant's prior crimes, in order to determine the likelihood of a defendant's future violent criminal activity.

Berget, 824 P.2d at 377.

We reject Fields's claim of error on this issue.

B. Using the Same Evidence to Support Different Aggravators

Fields cites no cases to support the proposition that it is improper to use the same evidence to support different aggravators. So long as the aggravators are not duplicative, see supra, we see no problem with this. It is commonplace to use one piece of evidence to prove different aspects of a case. For example, a gun might be used to prove the identity of the defendant (because the gun was registered to the defendant or because it had his fingerprints), the mode of death of the victim (whether he was shot or beaten with the butt), and the existence of a sentencing enhancement (felon in possession of a firearm). There is no error.

**IV. Was sufficient evidence presented to support the "prior violent felony" aggravator?**

Fields argues that there was insufficient evidence to support the prior violent felony aggravator because the testimony detailing the prior crime – snatching a purse from a 58-year-old woman – contained no evidence of violence or threats of violence. Notably, Fields does not dispute that he was validly convicted of first degree robbery. Rather, he argues that there was insufficient evidence to show that the facts underlying his robbery conviction included violence or threats of violence. The OCCA rejected this challenge on direct review. See Fields I, 923 P.2d at 637. Given our deferential standard of review, we must affirm.

A. Standard of Review

> Fields's sufficiency of the evidence challenge
>
> reduces, in essence, to a claim that the state court simply misapplied its own aggravating circumstance to the facts of this case. Because federal habeas corpus relief does not lie for errors of state law, federal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.

Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (citations omitted). "[I]n determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth

Amendment violation, we think the . . . appropriate standard of review is the 'rational factfinder' standard established in Jackson v. Virginia, 443 U.S. 307 (1979)." Id. at 781. Under the "rational factfinder" standard, a court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the [presence of the aggravating circumstance] beyond a reasonable doubt." Id. (emphasis in original).

Jeffers was decided in 1990, before enactment of AEDPA. AEDPA adds another layer of deferential review and has engendered some confusion in Tenth Circuit case-law in this area:

> Prior to AEDPA, we reviewed sufficiency of the evidence challenges de novo. See Moore v. Gibson, 195 F.3d 1152, 1176 (10th Cir. 1999). Under AEDPA, however, our standard of review is not as clear. There is precedent in the Tenth Circuit that a sufficiency of the evidence challenge is a legal question and other precedent suggesting it is a question of fact. See Moore, 195 F.3d at 1176-77 (collecting cases on both sides). If we treat the issue as a legal determination, we look to 28 U.S.C. § 2254(d)(1) and determine whether the state court decision was contrary to or an unreasonable application of clearly established federal law. If, on the other hand, it is a factual question, we look to § 2254(d)(2) and decide whether the state court decision was an unreasonable determination of the facts in light of the evidence presented to the state court. Further, § 2254(e)(1) requires us to afford a presumption of correctness to a state court's factual findings.

Hale v. Gibson, 227 F.3d 1298, 1335 n.17 (10th Cir. 2000); see also Thomas v. Gibson, 218 F.3d 1213, 1227 (10th Cir. 2000) (using same formulation and finding evidence insufficient to support aggravator); Medlock v. Ward, 200 F.3d

1314, 1321 & n.6 (10th Cir. 2000) (using same formulation and finding evidence sufficient to support aggravator); Moore v. Gibson, 195 F.3d 1152, 1176-77 (10th Cir. 1999) (same).  Thus, if we treat the issue as a legal determination under § 2254(d)(1) we ask whether the state court decision was contrary to or an unreasonable application of the "rational factfinder" standard.  On the other hand, if we treat the issue as a factual determination under § 2254(d)(2) and (e)(1) we ask whether Fields has rebutted the presumption of correctness by showing, by clear and convincing evidence, that the state court's decision was an unreasonable determination of the facts.

We have held, however, that it is possible to avoid deciding what standard of review applies when the petitioner's claims are clearly meritless under either standard.  See Hale, 227 F.3d at 1335 n.17 ("In this case, however, we do not determine which is the more appropriate analysis because Hale's claim lacks merit under either standard of review.").  Here, too, we follow this approach because we believe that under either of these highly deferential standards Fields's claim fails.

B. Merits

Oklahoma defines the "prior violent felony" aggravator as "a felony involving the use or threat of violence to the person." Okla. Stat. Ann. tit. 21, §

701.12(1). The OCCA has established,

> [T]he State is required to go beyond simple proof that a defendant in a capital case had prior felony convictions to establish the aggravating circumstance. The State must additionally prove that the prior felonies involved the use or threat of violence to the person. The fact that the prior felonies were committed and that the defendant committed them are properly and most easily proven through the use of the judgment and sentence. However, the element that the felonies involved the use or threat of violence is not so easily and summarily proven. It is therefore necessary that the State present sufficient information concerning the prior felony convictions to support its contention.

Brewer v. State, 650 P.2d 54, 62 (Okla. Crim. App. 1982). The Brewer court offered rape and second-degree murder as two examples of prior felonies that courts and parties might assume involve the use or threat of violence to the person, but that conceivably might not – the defendant might have committed statutory rape or second-degree murder by driving while intoxicated. See id. Thus, Brewer requires "the State [to] carry the burden of proving that the circumstances concerning a defendant's prior felony convictions are appropriate to its contention that the defendant should suffer the ultimate penalty of death." Id. at 63.

In this case, police detective Robert Cannon testified that on March 20, 1986, Fields had snatched a purse from a 58-year-old woman in a parking lot. The victim's daughter, who was walking with the victim when the robbery occurred, chased and caught up with Fields, who knocked her down during the struggle to

break free from her. Cannon described the crime as "a robbery by force." In addition, the government introduced, without objection, a certified judgment and sentence stating Fields had been convicted of first degree robbery on April 9, 1986. "First degree robbery" is defined in Oklahoma as "[r]obbery, when accomplished by the use of force, or of putting the person robbed in fear of some immediate injury to his person." Okla. Stat. Ann. tit. 21, § 797. On this record, we cannot state that the OCCA committed error under either AEDPA standard referred to above.

We affirm because we do not find that the OCCA unreasonably applied the "reasonable factfinder" standard nor do we find that Fields has rebutted the presumption of correctness by showing, by clear and convincing evidence, that the OCCA's factual determination was unreasonable.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to deny Fields's habeas petition.