PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

ERIC ALLEN PATTON,

       Petitioner-Appellant,

v.

       No. 03-6140

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

       Respondent-Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-99-1810-T)**

Scott W. Braden, Assistant Federal Public Defender, Death Penalty Federal
Habeas Corpus Division, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General, Criminal Division (W.A. Drew
Edmondson, Attorney General, and Brant M. Elmore, Assistant Attorney General,
with him on the brief), State of Oklahoma, Oklahoma City, Oklahoma, for
Respondent-Appellee.

Before **HENRY** , **BRISCOE** , and **O'BRIEN** , Circuit Judges

**HENRY** , Circuit Judge.

Petitioner Eric Allen Patton was convicted after a jury trial in the District Court for Oklahoma County of first-degree murder and first-degree burglary after former conviction of two or more felonies, in violation of OKLA. STAT. tit. 21 §§ 701.7, 1431, and 1451. As to the murder conviction, the jury found four aggravating circumstances and, upon the jury's recommendation, the trial court imposed the death penalty.

The Oklahoma Court of Criminal Appeals (OCCA) affirmed Mr. Patton's convictions on direct appeal, see Patton v. State, 973 P.2d 270 (Okla. Crim. App. 1998), and then denied his motion for post-conviction relief, see Patton v. State, 989 P.2d 983 (Okla. Crim. App. 1999). Subsequently, Mr. Patton filed a 28 U.S.C. § 2254 habeas corpus petition in the United States District Court for the Western District of Oklahoma, asserting twenty grounds for relief. The district court denied Mr. Patton's petition but, pursuant to 28 U.S.C. § 2253(c)(1)(A), granted a certificate of appealability on nine of his claims.

Mr. Patton now argues that: (1) the evidence was insufficient to support his first-degree murder conviction; (2) the trial court's evidentiary rulings violated his due process right to a fair trial; (3) improper comments from a prosecution witness concerning a former conviction also deprived him of his due process right to a fair trial; (4) the trial court erred in instructing the jury on the lesser-included

-2-

offense of voluntary manslaughter; (5) the trial court's instructions improperly allowed the jury to presume that the prosecution had proven the element of malice aforethought necessary to support his first-degree murder conviction; (6) the trial court's instructions prevented Mr. Patton from presenting a defense of voluntary intoxication; (7) the trial court erred in admitting duplicative evidence regarding two aggravating circumstances; (8) to support the death penalty, the prosecution relied upon evidence not proven beyond a reasonable doubt; and (9) prosecutorial misconduct in both the guilt and sentencing stages deprived Mr. Patton of a fair trial.

Upon thorough review of the record and the applicable law, we conclude that Mr. Patton is not entitled to relief on any of his claims. We therefore affirm the district court's denial of his § 2254 petition.

## I.  BACKGROUND

This case arises out of the killing of Charlene Kauer in Oklahoma City on December 16, 1994. The relevant facts are not in dispute and are set forth in the OCCA's opinion on direct appeal.     See Patton , 973 P.2d at 278-79.

At the time of Mrs. Kauer's killing, Mr. Patton was employed as a brick mason. In the morning, he borrowed a co-worker's car and left a job site, stating that he was going to buy electrical boxes at a local hardware store. Mr. Patton

-3-

was absent from the job site for four hours. When he returned, he was wearing different clothes and did not have the electrical boxes.

During that four-hour period, Mr. Patton went to Mrs. Kauer's home in northeast Oklahoma City and knocked on the front door. When Mrs. Kauer answered, Mr. Patton asked to borrow money, and she gave him ten dollars.

Mr. Patton then forced his way into the home, grabbed Mrs. Kauer by the throat and dragged her through the house looking for money and valuables. He took Mrs. Kauer to the bedroom and stabbed her numerous times. Then, he dragged her down the hallway into the kitchen, stabbing her several more times with a variety of knives and breaking several of them. Finally, he stabbed Mrs. Kauer in the chest with a pair of scissors.

Mr. Patton then left Mrs. Kauer's house, cleaned himself up, removed his bloody clothes, and changed into a pair of coveralls that he found in the co-worker's car. He left the bloody clothes in a field in northwest Oklahoma City and returned to the job site.

Initially, Mr. Patton was not a suspect in Mrs. Kauer's murder. However, because he had previously done some painting for Mrs. Kauer and her husband and had worked with them at a marketing company, Oklahoma City Police Department detectives conducted a series of interviews with him. They arrested Mr. Patton after discovering his fingerprints at the murder scene.

During his initial police interview, Mr. Patton denied any involvement in the murder. He then stated that he had seen a suspicious vehicle at Mrs. Kauer's house and added that the person who committed the murder would have had to have control of the Kauers' dogs, thereby suggesting that Mr. Kauer was involved. When asked about a scratch on his lip and cuts on his hands, he explained that he was changing a tire and the jack had slipped and hit him.

During a subsequent interview, Mr. Patton stated that Chris Williams, the co-worker whose car he had borrowed on the day of the murder, was involved in the crime. He added that he had a lot of information to give them but was protecting someone. Mr. Patton explained that he had been at the Kauers' home but that another person had committed the murder.

In another interview, Mr. Patton admitted that Chris Williams was not involved in the murder but then stated that a woman had been involved. Mr. Patton reported that this woman had stabbed Mrs. Kauer while he wrestled with her dog, eventually stabbing it. He explained that the cuts on his hand and the scratch on his lip came from the dog's bites.

In a final interview, Mr. Patton described the killing as though he had had an out-of-body experience. He admitted seeing himself at the murder scene and stabbing Mrs. Kauer, but he said there were demonic forces present and the victim was a demon. He added that he had ingested cocaine before the murder and

believed the drug was laced with another drug. He said he was "tripping" from the effects of the drugs.

Mr. Patton was tried before a jury in the District Court for Oklahoma County in November 1996. The prosecution presented forensic evidence indicating that Mr. Patton's fingerprints were present in the Kauer home and that blood at the scene matched Mr. Patton's type. The prosecution also presented video and audiotapes of Mr. Patton's interviews with police detectives in which he admitted stabbing Mrs. Kauer.

In response, Mr. Patton presented expert testimony from a psychiatrist, Dr. John Smith. Dr. Smith testified that, on the day of the killing, Mr. Patton was in a cocaine delirium. As a result, Dr. Smith said, Mr. Patton was not capable of forming the intent to commit a crime "in a cognitive, logical sense like we think of." Tr. Trans. vol. IX, at 143.

After hearing this evidence, the jury convicted Mr. Patton of first-degree murder and first-degree burglary. Then, upon considering additional evidence presented during the sentencing phase, the jury recommended that the court impose the death penalty. The jury found four aggravating circumstances: (1) Mr. Patton was previously convicted of a felony involving the use or threat of violence; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest

or prosecution; and (4) the murder was committed while Mr. Patton was on parole for California felony convictions. The jury did <u>not</u> find a fifth aggravating circumstance alleged by the prosecution, that it was probable that Mr. Patton would commit criminal acts of violence that would constitute a continuing threat to society.

## II. DISCUSSION

We begin our analysis by discussing the standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Then, we proceed to the merits.

### A. Standard of Review

Because Mr. Patton filed his § 2254 habeas corpus petition after AEDPA's effective date, its provisions apply to this appeal. <u>See</u> <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1264 (10th Cir. 1999). Under AEDPA, a federal court may only grant habeas relief on any claim adjudicated on the merits by the state court if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding," id. § 2254(d)(2). In addition, AEDPA directs federal courts adjudicating state habeas corpus proceedings to presume that the factual findings of the state court are correct unless the petitioner rebuts this presumption by clear and convincing evidence. See id. § 2254(e)(1); Smith v. Mullin, 379 F.3d 919, 924-25 (10th Cir. 2004).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court provided guidance as to when a state court decision may be deemed "contrary to" or "an unreasonable application of" established Supreme Court precedent pursuant to § 2254(d)(1). As to the former term, the Court explained that a state court decision is "contrary to" the Court's clearly established precedent in two circumstances: (1) when "the state court applies a rule that contradicts the governing law set forth in [the Court's] cases"; and (2) when "the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from" the result reached by the Supreme Court. Williams, 529 U.S. at 405-06. "Avoiding these pitfalls does not require citation of [Supreme Court] cases--indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002).

As to the latter term, the Court explained that a state court decision constitutes an unreasonable application of Supreme Court precedent if "the state

court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."     Id. at 413.  Thus, "[u]nder § 2254(d)(1)'s 'unreasonable application' clause, . . .  a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."     Id. at 411;  see also  Thomas v. Gibson  , 218 F.3d 1213, 1219-20 (10th Cir. 2000) (discussing      Williams ).

In this case, our application of AEDPA is complicated by the OCCA's seemingly exclusive reliance on state law decisions to resolve some of Mr. Patton's claims and by the fact that, as to some of those claims, the applicable federal and state law standards arguably differ.  In this circuit, our AEDPA cases do not appear entirely consistent in announcing the appropriate standard of review when, as here, a 28 U.S.C. § 2254 petitioner has asserted federal and state claims on direct appeal but the OCCA's ruling cites only state court decisions.

For example, in   Ellis v. Mullin, 326 F.3d 1122, 1128-29 (10th Cir. 2003), we engaged in de novo review of a petitioner's federal due process claim when the OCCA upheld the exclusion of evidence on state law grounds only.  See also  Cargle v. Mulln, 317 F.3d 1196, 1202-05 (10th Cir. 2003) (noting that the OCCA's analysis of an ineffective assistance of counsel claim was based on a

standard, set forth in one of its prior decisions, that was inconsistent with the federal standard and concluding that, as a result, "the OCCA"s analysis . . . is not entitled to deference").

In contrast, in Torres v. Mullin, 317 F.3d 1145, 1152 n.3 (10th Cir. 2003) we reviewed a federal due process challenge to the sufficiency of the evidence under the deferential AEDPA standard. Even though the OCCA had not cited federal cases, we regarded its decision as an application of federal law because the state and federal standards for determining the sufficiency of the evidence were identical. Id.; see also Cook v. McCune, 323 F.3d 825, 830-31 (10th Cir. 2003) (applying AEDPA deference to an OCCA ruling on a Confrontation Clause claim that cited only Oklahoma cases but not discussing whether the state and federal standards are identical); see also Ellis, 326 F.3d at 1131 (Brorby, J., dissenting) (noting "apparent conflict" in this circuit's decisions regarding the deference afforded state court decisions citing only state law).

In determining the appropriate level of review under AEDPA, we have also considered whether the state standard "is at least as favorable to the petitioner as the federal standard." Harris v. Poppell, 411 F.3d 1189, 1196 (10th Cir. 2005). Thus, "if the OCCA rejected [the petitioner's] claim under a standard that is equally or more favorable to him relative to the federal standard, the state court's decision constitutes an adjudication of the federal claim despite citing no federal

decisions." Id. "Obviously, in such a case, 'neither the reasoning nor the result' of the state-court decision would contradict federal law." Id. (quoting Early, 537 U.S. at 9); see also Romano v. Gibson, 239 F.3d 1156, 1164 (10th Cir. 2001) (following this approach); Ellis, 326 F.3d at 1131 (Brorby, J., dissenting) (adopting the view that "if a state court decision denies a claim on a state law ground rendering the federal claim meritless, or otherwise resulting in its denial, the state court decision lacks any affirmative indication that the state court did not consider the federal claim").

Here, as to Mr. Patton's first, second, third, fourth, fifth, sixth, seventh, and ninth claims, the OCCA either directly applied federal law or applied state law standards "at least as favorable to [him] as the federal standard[s]." Harris, 411 F.3d at 1196. We therefore consider whether its decisions on those claims were unreasonable under AEDPA. See Torres, 317 F.3d at 1152 n.3. However, as to Mr. Patton's eighth claim (regarding testimony offered by the prosecution during the sentencing phase) the record indicates that he did not raise this claim in the state court proceedings. That claim is thus unexhausted and is now procedurally barred. See Spears v. Mullin, 343 F.3d 1215, 1255 (10th Cir. 2003). However, we exercise our discretion and reject that claim on the merits. See 28 U.S.C. § 2254(b)(2); Romero v. Furlong, 215 F.3d 1107, 1111 (10th Cir. 2000).

-11-

## B. Claim 1: Sufficiency of the Evidence

Mr. Patton first argues that the OCCA unreasonably applied federal law by concluding that the evidence presented at trial was sufficient to support his first-degree murder conviction. Mr. Patton invokes the testimony of Dr. John Smith, the psychiatrist who examined Mr. Patton and reviewed his medical records.

According to Dr. Smith, Mr. Patton was incapable of forming the intent necessary to commit first-degree murder. In particular, when Mr. Patton's trial counsel asked Dr. Smith whether "[i]n your professional opinion after [Mr. Patton] entered [Mrs. Kauer's] home do you think he was capable of forming the intent to commit a crime?" Dr. Smith responded, "Not in a cognitive, logical sense like we think of. I think from then on he was in fact simply reacting to the cocaine intoxication once he saw her." Tr. Trans. vol. IX, at 143.

Dr. Smith then described the "cocaine-induced psychosis" suffered by Mr. Patton as "a discharge from the brain of inten[se] aggression and inability to control his reaction." Id. According to Dr. Smith, "[s]ome of [the] things [that Mr. Patton] said in the police report [indicated that] he was out of his body watching it. He couldn't control it. He didn't know why he was doing it. He couldn't stop it." Id. at 143-44.

In advancing this argument, Mr. Patton faces a high hurdle. The appropriate inquiry is whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979) (internal citations omitted). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id.

Moreover, the AEDPA adds an additional degree of deference to state courts' resolution of sufficiency of the evidence questions. See Valdez v. Ward, 219 F.3d 1222, 1237 (10th Cir. 2000) ("Under AEDPA, however, where a habeas petitioner's sufficiency of the evidence challenge has already been decided in state court, we employ a more limited review."). Thus, the question before us is whether the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the Jackson standard. See Torres v. Mullin, 317 F.3d 1145, 1151 (10th Cir. 2003).

On this question, the opinions of the OCCA and the federal district court explain the evidence upon which a rational juror could have relied in rejecting Mr. Patton's intoxication defense and concluding beyond a reasonable doubt that Mr. Patton possessed the intent necessary to support the first-degree murder charge. In particular, after initially denying any involvement in the killing of Mrs. Kauer, Mr. Patton admitted driving to Mrs. Kauer's house and stabbing her. Moreover, after

-13-

the killing, Mr. Patton had the presence of mind to clean himself up and exchange his bloody clothes for those of his coworker Mr. Williams. Finally, the prosecution introduced testimony from both Sandra Moore, Mr. Patton's girlfriend, and from Mr. Williams, that Mr. Patton's demeanor seemed normal on the day of the killing, evincing no signs of delirium or strange behavior.

Although Dr. Smith's testimony that Mr. Patton was suffering from a cocaine delirium conflicted with some of this evidence, a rational jury could have rejected that testimony, relying on the prosecution's evidence that Mr. Patton possessed the requisite intent, and convicted Mr. Patton of the first-degree murder charge. Accordingly, the OCCA did not unreasonably apply federal law in concluding that the evidence was sufficient to support Mr. Patton's conviction.

## C. Claim 2: Evidentiary Rulings

Mr. Patton challenges five evidentiary rulings of the trial court. He maintains that these rulings improperly restricted his right to present his intoxication defense, thereby violating his due process right to a fair trial.

In upholding the trial court's evidentiary rulings on direct appeal, the OCCA referred only to state law. See Patton, 973 P.2d at 287. In particular, the OCCA cited Jackson v. City of Oklahoma City, 678 P.2d 725, 726 (Okla. Crim. App. 1984) (per curiam), a case which holds, as a matter of state law, that "the scope of

cross-examination rests within the sound discretion of the trial court" and that

"[o]nly in cases of clear abuse of this discretion, resulting in manifest prejudice,

will [the OCCA] reverse the trial court's decision." Id. Nevertheless, Mr. Patton

and the respondent both contend that this court should apply AEDPA's deferential

standard of review to the OCCA's adjudication of this claim. See Aplt's Br. at 8;

Aple's Br. at 16-17. That view is supported by the similarities in the state and

federal formulations of standards for granting relief when the trial court excludes

evidence. Compare United States v. Valenzuela-Bernal, 458 U.S. 858, 868 (1982)

(concluding that, in order to establish a violation of his due process right to

present evidence, a defendant must show that the excluded evidence was material)

with Gee v. State, 538 P.2d 1102, 1107 (Okla. Crim. App 1975) (finding no error

because "the scope of the cross-examination was not limited on the material

elements of the case"). Accordingly, we must determine whether the OCCA's

ruling constituted an unreasonable application of federal law.[1]

---

[1] We note that there are some decisions that suggest that the federal standard for obtaining relief for the exclusion of evidence is arguably more favorable to the petitioner than the state standard. Compare Richmond v. Embry, 122 F.3d 866, 872 (10th Cir. 1997) (stating that, to prevail on a federal due process claim, the defendant must show that the trial court excluded material evidence and that, under this standard, "[e]vidence is material if its suppression might have affected the trial's outcome" and citing Valenzuela-Bernal, 458 U.S. at 868) (emphasis added) with Layton v. Purcell, 267 P.2d 547, 554 (Okla. 1954) (stating that, in order to establish the "manifest prejudice" required under state law, the defendant must show that "the verdict or judgment would probably have been different had [the errors in excluding evidence] not occurred"). However, even if we were to

(continued...)

-15-

The Supreme Court had held that "the rights to confront and cross-examine witnesses and to call witnesses in one's own behalf [are] essential to due process." Chambers v. Mississippi, 410 U.S. 284, 294 (1973). "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the [due process] right to present his own witnesses to establish a defense." Washington v. Texas, 388 U.S. 14, 19 (1967). Thus, a state court may not apply a rule of evidence "mechanistically to defeat the ends of justice." Chambers, 410 U.S. at 302. However, [t]he right to present relevant testimony . . . may, in appropriate cases, 'bow to accommodate other legitimate interests in the criminal trial process.'" Rock v. Arkansas, 483 U.S. 44, 55 (1987) (quoting Chambers, 410 U.S. at 295). In order to establish a violation of his due process right to present evidence, a defendant must show that the evidence excluded by the trial court's ruling might have affected the trial's outcome; in other words, he must show that the evidence, if admitted, would have created reasonable doubt that did not exist without the evidence. Valenzuela-Bernal, 458 U.S. at 868.

Mr. Patton first challenges the trial court's exclusion of testimony regarding prayer meetings at Mrs. Kauer's home. Mrs. Kauer's husband testified about those meetings, but the trial court sustained the prosecution's objections to cross-

---

[1](...continued)
afford Mr. Patton the benefit of the doubt and examine his federal due process claim de novo, we would still conclude that he is not entitled to relief.

-16-

examination questions about those meetings. According to Mr. Patton, this cross-examination was relevant to his cocaine intoxication defense.

Second, Mr. Patton challenges the trial court's restrictions on cross-examination of Chris Williams, the co-worker who loaned Mr. Patton his car on the day of the killing. During cross-examination, Mr. Patton's attorney attempted to ask Mr. Williams about Mr. Patton's past cocaine use. The prosecutor objected, and the trial judge ruled that Mr. Patton's attorney could only ask about cocaine use on the day of the killing and the day before. The court reasoned that evidence of Mr. Patton's prior cocaine use was not relevant to his intoxication defense. According to Mr. Patton, his trial counsel was attempting to set out a history of intoxication to support his intoxication defense and the trial judge's ruling prejudiced that defense.

Third, Mr. Patton challenges the exclusion of similar testimony from Oklahoma City Police Detective Bill Cook. Mr. Patton's attorney sought to question the detective about how much money Mr. Patton had spent on drugs while living in California, but the trial court did not allow him to do so.

Fourth, Mr. Patton challenges the trial court's restriction on the cross-examination of his girlfriend Sandra Moore, a prosecution witness who testified that his demeanor on the day of the crime seemed normal. Mr. Patton's lawyer

sought to question her about having made a false statement to Mr. Patton that she was pregnant with twins, but the trial court did not allow this question.

Finally, Mr. Patton challenges the trial court's restricting the direct examination of Dr. Smith. During an in camera hearing, the trial judge ruled that Dr. Smith could not discuss statements made by Mr. Patton concerning Mr. Patton's prior cocaine use and addiction. Again, Mr. Patton contends that this testimony was directly related to Dr. Smith's psychiatric evaluation and to his conclusion that Mr. Patton was suffering from a cocaine delirium.

Upon review of the record, we conclude that Mr. Patton has failed to establish that any of this evidence, "if [] admitted would create reasonable doubt that did not exist without the evidence." Richmond v. Embry, 122 F.3d 866, 872 (10th Cir. 1997) (citing Valenzuela-Bernal, 458 U.S. at 868). The evidence is therefore not material and its exclusion did not violate Mr. Patton's due process right to a fair trial.

In particular, as to the prayer meeting evidence, we agree with the OCCA and the district court that Mr. Patton has failed to offer a coherent explanation of its relevance to the key issue at trial—whether Mr. Patton was so intoxicated at the time of crime that he could not form the intent to murder Mrs. Kauer.

As to the trial court's refusal to allow questioning of Sandra Moore regarding her allegedly false statement about being pregnant, the OCCA

-18-

reasonably concluded that the statement was collateral to the issues in the case. See Patton, 973 P.2d at 288; Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (stating that "trial judges retain wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant").  Moreover, even assuming that Ms. Moore's statement, if false, could have been viewed by the jury as damaging her credibility when she testified that Mr. Patton appeared "normal" on the day of the killing, Mr. Patton is still not entitled to relief.  Because there was other evidence supporting Ms. Moore's statements about Mr. Patton's "normal" demeanor, the possible impeachment value of Ms. Moore's allegedly false statement does not render the statement material under the due process standard.  In particular,  Mr. Williams also testified about Mr. Patton's "normal" demeanor on the day of the killing.  More importantly, as the OCCA and the district court observed, Mr. Patton's own account of the crime and his attempts to conceal it by hiding his bloody clothes and changing into Mr. Williams' coveralls supported the prosecution's contention that he intended the killing.

As to the exclusion of testimony from Chris Williams, Detective Cook, and Dr. Smith regarding Mr. Patton's prior cocaine use, Mr. Patton has also failed to establish that this evidence was material under the due process standard.  As the

-19-

OCCA observed, the jury heard substantial evidence regarding Mr. Patton's drug use on the day of the crime. Through this evidence, Mr. Patton was allowed to present his intoxication defense. Moreover, despite the trial judge's rulings, the jury did hear some evidence of Mr. Patton's prior cocaine use. In particular, Chris Williams testified that he had observed Mr. Patton under the influence of cocaine prior to the killing. Tr. Trans. vol. VIII, at 176. In addition, Dr. Smith testified that Mr. Patton was addicted to cocaine. Tr. Trans. vol. IX, at 121. Dr. Smith also explained that the fact that Mr. Patton tested positive for cocaine a week after the killing indicated that Mr. Patton had used cocaine on a regular basis. Id. at 212.

In light of all of this testimony, the additional evidence of prior drug use that Mr. Patton unsuccessfully sought to introduce would not have created reasonable doubt that did not exist without the evidence. Valenzuela-Bernal, 458 U.S. at 868. Thus, the trial court did not violate Mr. Patton's due process rights by excluding it.

### D. Claim 3: Reference to Prior Conviction

Mr. Patton next challenges the admission of a statement by police chemist Susan Rose. While testifying about obtaining blood samples from Mr. Patton, Ms. Rose stated that Mr. Patton asked her how many other suspects there were and told

her "I'm an ex-con." Tr. Trans. vol. VII, at 113. This statement drew an immediate objection from Mr. Patton's counsel and a request for a mistrial. After extended *in camera* argument, the trial court denied the motion for mistrial and offered to admonish the jury. Although he initially objected to the admonishment, Mr. Patton's counsel subsequently agreed to the trial judge telling the jury to disregard Ms. Rose's "ex-con" statement.

On direct appeal, the OCCA concluded that the admonishment was sufficient to cure the prejudice resulting from the "ex-con" remark. The OCCA rejected Mr. Patton's argument that the case was analogous to United States v. Sands, 899 F.2d 912 (10th Cir. 1990). There, this court held that a cautionary instruction was not sufficient to cure a statement about the defendant's prior conviction. The OCCA then invoked "its long standing position that when inadmissible evidence or an improper comment is presented to a jury, an admonishment to the jury by the court that the evidence or comment is not to be considered will cure any error." Patton, 973 P.2d at 292-93 (discussing Cheatham v. State, 900 P.2d 414, 425 (Okla. Crim. App. 1995)). The OCCA also cited another of its decisions, Al-Mosawi v. State, 929 P.2d 270, 284 (Okla. Crim. App. 1996), which holds that "a trial court's admonition to the jury to disregard the remarks of counsel or a witness usually cures any error unless it is of such [a] nature, after considering the evidence, that the error appears to have determined

the verdict." Id. The OCCA concluded that the trial court's admonition to disregard the reference to Mr. Patton's prior conviction was sufficient to cure any error because the reference "was not likely to make a sufficiently strong impression on the jury that it was unable to disregard it." Patton, 973 P.2d at 293.

We view the OCCA's decision as an application of federal law and therefore review it under the deferential AEDPA standard. Even though the OCCA cited both state and federal cases, it ultimately applied the standard established by federal law. Compare Greer v. Miller, 483 U.S. 756, 766 n. 8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant.") (internal quotation marks and citations omitted) (emphasis added) with Patton, 973 P.2d at 293 (concluding that the prior conviction "was not likely to make a sufficiently strong impression on the jury") (emphasis added).[2]

_____

[2] As with Mr. Patton's second claim, we note that there are some decisions that suggest that the federal standard is arguably more favorable to the petitioner. Compare Greer, 483 U.S. at 766 n.8 ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant.") (internal quotation marks and citations omitted) (emphasis added) with Al-Mosawi, 929 P.2d at 84 (stating that a curative instruction "usually cures any error unless it is of such [a] nature, after

(continued...)

-22-

In advancing this claim, Mr. Patton again confronts a high hurdle. He must establish that Ms. Rose's "ex-con" statement was so unduly prejudicial that it rendered his trial fundamentally unfair. See Payne v. Tennessee, 501 U.S. 808, 825 (1991); see also Nichols v. Sullivan, 867 F.2d 1250, 1253 (10th Cir. 1989) (stating that "[the] state courts' evidentiary and procedural rulings may not be questioned unless [the habeas petitioner] demonstrates that the remark by [a] witness . . . was so prejudicial in the context of the proceedings as a whole that he was deprived of the fundamental fairness essential to the concept of due process" and citing Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)). Moreover, in a habeas proceeding, any trial errors will be deemed harmless unless they had a substantial and injurious effect or influence in determining the verdict. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). If we are in grave doubt as to the harmlessness of an error, the habeas petitioner must prevail. See O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "Grave doubt" exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself "in virtual equipoise" regarding the error's harmlessness. Id. at 435.

Two of this circuit's decisions illustrate the appropriate inquiry. As Mr. Patton notes, in Sands we held that a new trial was warranted when two witnesses

---

[2](...continued)
considering the evidence, that the error appears to have determined the verdict") (emphasis added). Nevertheless, even if we were to apply a de novo standard, we would conclude that Mr. Patton is not entitled to relief on this claim.

referred to the defendant's prior incarceration and the defendant declined the court's offer to give a cautionary instruction. Noting that the prosecution's evidence was "not overwhelming," we stated that we could not say "with reasonable certainty that the reference to prior records had but very slight effect on the verdict of the jury." 899 F.2d at 915-16. We therefore concluded that the defendant was entitled to a new trial.

In contrast, in United States v. Joe, 8 F.3d 1488, 1498 (10th Cir. 1993), we concluded that a reference to the defendant's prior incarceration "was a single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction." Because the reference "had but very slight effect on the verdict of the jury," the defendant was not entitled to a new trial. Id. (internal quotation marks omitted),

Here, we conclude that the prosecution witness's reference to Mr. Patton's prior conviction was not so prejudicial as to deprive him of a fair trial. The reference was brief, and there is no indication that it was intentionally elicited by the prosecution. Moreover, the trial court instructed the jury to disregard the reference, and Mr. Patton has failed to establish either an "overwhelming probability" that the jury was unable to follow that curative instruction or "a strong likelihood" that the effect of the evidence would be "devastating" to the defendant." See Greer, 483 U.S. at 766 n.8 (internal quotation marks omitted).

-24-

The issue in the guilt phase was whether Mr. Patton was so intoxicated that he was unable to form the intent necessary to commit the crime of first-degree murder. Mr. Patton's intoxication defense turned largely on the testimony of his expert witness, Dr. Smith, who opined that Mr. Patton had been in a cocaine-induced delirium when he killed Mrs. Kauer. We see little indication in the record that the jury's assessment of Dr. Smith's testimony on this matter was affected by the passing reference to Mr. Patton's prior record.

Finally, we agree with the district court that our decision in Sands is distinguishable. In that case, the defendant's first trial had ended in a mistrial, and the jury informed the judge that it had been divided on the issue of premeditation. Sands, 899 F.2d at 913. At the second trial, two witnesses referred to the defendant's prior record, despite the trial judge's order barring such evidence. Moreover, one of the defendant's contentions was that he had acted in self-defense. In such a case, there is a considerably greater probability than there is here that the defendant's prior record might influence the jury. See Greer, 483 U.S. at 766 n.8. In particular, a jury might well conclude that a convicted criminal was more likely to commit an act of unprovoked violence than a citizen with no prior record. Here, at trial, Mr. Patton did not dispute that he attacked Mrs. Kauer, and there is little indication that his prior record influenced the jury in such a manner.

## E. Claim 4: Manslaughter Instruction

Mr. Patton challenges the trial court's instruction on manslaughter. As he did before the OCCA, Mr. Patton argues that the instructions' reference to "heat of passion" did not fit the facts of this case. He contends that "heat of passion" was not involved in this case, and that, instead, the killing was a case of "dangerous weapon" manslaughter. According to Mr. Patton, to mention "heat of passion" and "provocation" in the instructions merely confused the jury and left it with no options other than guilt of first-degree murder or acquittal, in violation of the due process requirements of Beck v. Alabama, 447 U.S. 625 (1980).

In rejecting this argument, the OCCA considered the state manslaughter statute, OKLA. STAT. tit. 21 § 711, concluding that "first degree heat of passion manslaughter can be committed in either of two ways, i.e., in a cruel and unusual manner or by means of a dangerous weapon. In either case, 'heat of passion' is an element of the offense of first degree manslaughter." Patton, 973 P.2d at 289 (citing Brown v. State, 777 P.2d 1355, 1357 (Okla. Crim. App.1989)) (emphasis in original).

Mr. Patton now asserts a federal claim, contending that the trial court violated his due process rights by failing to instruct the jury properly on the elements of first-degree manslaughter. See Patterson v. New York, 432 U.S. at 210 ("[T]he Due Process Clause requires the prosecution to prove beyond a

-26-

reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."); see also Rael v. Sullivan, 918 F.2d 874, 875 (10th Cir. 1990) (explaining that a "complete failure to instruct [the jury] on an essential element of an offense violates the right to due process"). However, the due process inquiry is controlled by the state law analyzed by the OCCA. See McMillan v. Pennsylvania, 477 U.S. 79, 85 ("[I]n determining what facts must be proved beyond a reasonable doubt the state legislature's definition of the elements of the offense is usually dispositive."); Chapman v. LeMaster, 302 F.3d 1189, 1196 (10th Cir. 2002) ("On habeas review, however, the [state] courts' interpretation of the state . . . statute is a matter of state law binding on this court."). We therefore view the OCCA's decision on this issue as an application of the federal due process standard, and we consider whether that decision was unreasonable.

Upon review of the record and the applicable law, we see little merit in Mr. Patton's due process challenge to the voluntary manslaughter instruction. As the OCCA observed, Oklahoma law requires proof of "heat of passion" in "dangerous weapon" manslaughter. That requirement is based on the relevant Oklahoma statute, which provides:

> Homicide is manslaughter in the first degree in the following cases:

-27-

1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

3. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed.

OKLA. STAT. tit. 21 § 711 (emphasis added).

Oklahoma courts have interpreted section 2 to require a finding of both "heat of passion" and either "in a cruel and unusual manner" or "by means of a dangerous weapon." See Brown, 777 P.2d at 1357. Oklahoma is entitled to define the elements of manslaughter as it sees fit, and, as a result, Mr. Patton does not have a federal constitutional right to a particular definition of manslaughter.

Moreover, the trial court did instruct the jury on the lesser-included offense of second-degree murder. That instruction satisfied the due process requirements of Beck. See Schad v. Arizona, 501 U.S. 624, 647 (1991) (stating that "[the] central concern of Beck [forcing the jury into an all-or-nothing choice between capital murder and innocence] . . . [was] not implicated" because the jury was instructed on first and second-degree murder).

Accordingly, Mr. Patton is not entitled to relief on this claim.

-28-

## F. Claim 5: Alleged Presumption in Malice Aforethought Instruction

Next, Mr. Patton challenges jury instruction 30, which concerns the intent necessary to establish first-degree murder under Oklahoma law. That instruction states that

> [a] design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed.

Rec. vol. III, at 537. The instruction mirrors the language of a state statute. See OKLA. STAT. TIT. 21 § 702.[3]

According to Mr. Patton, this instruction improperly relieved the prosecution of its burden of proving that he possessed the required intent. He contends that the instruction established a presumption that, because Mr. Patton killed Mrs. Kauer, he intended to do so.

In rejecting this argument, the OCCA considered the instructions as a whole and concluded that "the jury was instructed on the elements of first degree murder,

---

[3] In Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003), cert. denied sub nom. Powell v. Mullin, 124 S. Ct. 1615 (2004), we cited this provision as support for a jury's inference that a petitioner formed the intent to kill during an assault. However, the petitioner did not contend that the statute established an improper presumption, and we thus did not consider that issue. See also Hogan v. Gibson, 197 F.3d 1297, 1308 n.9 (10th Cir. 1999) (quoting, without comment, § 702 in support of the proposition that "under Oklahoma law . . . . [t]he design to effect death 'is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed'"); Hooks v. Ward, 184 F.3d 1206, 1231 (10th Cir. 1999) (same); Stouffer v. Reynolds, 168 F.3d 1155, 1171 (10th Cir. 1999) (same); Duvall v. Reynolds, 139 F.3d 768, 786 n.3 (10th Cir. 1998) (same).

that each element must be proven by the State beyond a reasonable doubt, and that 'malice aforethought' means 'a deliberate intent to take away the life of a human being.'" Patton, 973 P.2d at 289. The OCCA cited state court decisions rejecting the same improper presumption argument now raised by Mr. Patton. See id. (citing Davis v. State, 665 P.2d 1186, 1195 (Okla. Crim. App. 1983) and Hall v. State, 635 P.2d 618, 620-21 (Okla. Crim. App. 1981)). Those state court decisions apply the same principles as our federal precedent, requiring the trial court to instruct the jury that the prosecution must prove all of the elements beyond a reasonable doubt and holding that the jury may not be allowed to presume the existence of any particular element. Compare Davis, 665 P.2d at 1195, and Hall, 635 P.2d at 620-21 with Wiley v. Rayl, 767 P.2d 679, 681 (10th Cir. 1985). Accordingly, we view the OCCA's decision on this issue as an application of federal law. See Torres, 345 F.3d at 1151. Under the AEDPA, we must determine whether that application was unreasonable. Williams 529 U.S. at 405-06.

Mr. Patton's challenge to this jury instruction is based upon the "bedrock, axiomatic, and elementary principle" that the prosecution prove beyond a reasonable doubt every fact necessary to constitute the crime with which a defendant is charged. See In re Winship, 397 U.S. 353, 364 (1970). This principle, incorporated into the Due Process Clause of the Fourteenth Amendment, bars a state from establishing through a jury instruction an evidentiary presumption

-30-

that relieves the prosecution of proving the elements of the charged offense. Francis v. Franklin, 471 U.S. 307, 312-13 (1985).

In analyzing this issue, we must determine whether the challenged instruction establishes a prohibited presumption or, in the alternative, merely allows a permissive inference. A mandatory presumption "instructs the jury that it must infer the presumed fact if the State proves certain predicate facts." Id. at 314. Such a presumption violates the Due Process Clause if it relieves the state of its burden of persuasion on an element of the offense. Id. In contrast, a permissive inference "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." Id. Because the prosecution is still required to convince the jury that the suggested conclusion should be inferred based upon the predicate facts proved, a permissive inference does not relieve the state of its burden of persuasion. Thus, a permissive inference violates the Due Process Clause "only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." Id. at 314-15.

We begin with the language of the challenged instruction. If the instruction could have been reasonably understood by the jury as creating an impermissible presumption, we consider the instructions as a whole. Id. at 315. "Other instructions [may] explain the particular infirm language to the extent that a

reasonable juror could not have considered the charge to have created an unconstitutional presumption." Id.

Applying these standards, the Supreme Court has found an impermissible mandatory presumption in a jury instruction stating that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." Sandstrom v. Montana, 442 U.S. 510, 513 (1979). That instruction, the Court concluded, could have been read by the jury as relieving the prosecution of its burden of proving that the defendant "purposefully or knowingly" caused the death of the victim. A reasonable jury could have interpreted the presumption as conclusive—"an irrebuttable direction by the court to find intent once convinced of facts triggering the presumption." Id. at 517. Alternatively, the jury may have read the instruction as a directive to find intent, unless the defendant proved the contrary by some evidence, "thus effectively shifting the burden of persuasion on the element of intent." Id.

In Franklin, 471 U.S. at 313, the Court struck down another instruction regarding the proof of intent in a malice murder prosecution. There, the challenged instruction stated that "[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted." The Court reasoned that "[the] statement that the presumption 'may be rebutted' could have indicated to a reasonable juror that the defendant

bore an affirmative burden of persuasion once the State proved the underlying act giving rise to the presumption." Id. at 318.

This circuit has applied these principles to several similar instructions. For example, in Wiley, 767 F.2d at 681, the trial judge instructed the jury that "[t]here is the presumption that a person intends all of the natural and probable consequences of his voluntary acts." As in Franklin, the trial judge added that "[t]his presumption is overcome if you are persuaded by the evidence that the contrary is true." Id. We concluded that this instruction violated the defendant's due process rights by establishing an improper presumption. The instruction "effectively told [the jury] to presume a criminal intention by the defendant once the state has established that he acted voluntarily" and "inform[ed] the jury that the defendant may rebut the presumption by contrary evidence." Id. Even though other instructions informed the jury that the defendant was presumed innocent and that the state was required to prove intent, "a reasonable juror still could have read the instructions as a whole as shifting the burden of persuasion." Id.

In contrast, in Davis v. Maynard, 869 F.2d 1401, 1405-06 (10th Cir. 1989), vacated on other grounds by Saffle v. Davis, 494 U.S. 1050 (1990), we considered a challenge to an instruction in a malice murder case stating that "[a] design to effect death may be inferred from the fact of the killing when that killing is done by the use of a dangerous weapon in such a manner as naturally and probably to

cause death unless the circumstances raise a reasonable doubt whether such a design existed." We characterized this instruction as stating an entirely permissive inference. Under this instruction, we reasoned, "the jury could properly find a 'design to effect death' based upon the circumstances surrounding the killings." Id. However, "the jury was equally free to reject the inference if it found that the predicate facts proved by the State did not justify the suggested conclusion. Thus, the burden of proof did not shift to [the defendant]." Id.

The instruction challenged by Mr. Patton differs from those at issue in Sandstrom, Franklin, Wiley, and Davis. Unlike the instructions struck down in the first three of those cases, the instruction before us contains language suggesting that the alleged presumption or inference—that the defendant had "a design to effect death"—is not applicable if "the circumstances raise a reasonable doubt whether such design existed." Moreover, unlike the instructions struck down in Franklin and Wiley, the instruction challenged here does not contain language expressly indicating that the defendant has the burden of rebutting the presumption. See Franklin, 471 U.S. at 311 (stating that "the presumption may be rebutted"); Wiley, 767 F.2d at 681 (stating that "[t]his presumption is overcome if you are persuaded by the evidence that the contrary is true").

Nevertheless, the instruction here also differs from the one upheld in Davis as an "entirely permissive inference or presumption." 869 F.2d at 1405. The

Davis instruction informed the jury that "a design to effect death <u>may be inferred</u> from the fact of the killing" by the use of a dangerous weapon, <u>id.</u>, while Mr. Patton's instruction states that "[a] design to effect death <u>is</u> inferred" from those circumstances. (emphasis in original)

The use of the phrase "is inferred" is troubling. Read in isolation, it suggests a mandatory presumption—that the jury is required to infer an intent to kill from the fact of the killing. As Mr. Patton notes, that concern is shared by the OCCA Committee for Preparation of Uniform Criminal Jury Instructions, which has warned that "[t]he mandatory connotation of the language 'is inferred' [in instructions based on OKLA STAT. TIT. 21 § 702] may prove confusing to jurors because it suggests a conclusion that the jury is required to draw where they find that the defendant killed the deceased, unless reasonable doubt is raised by the circumstances. Therefore, this language should be avoided." OKLAHOMA UNIFORM JURY INSTRUCTIONS--CRIMINAL, § 4-63, at 149 (2d ed. 1996).[4]

---

[4] The Committee has recommended the following instruction regarding proof of intent:

> The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of a defendant to take a human life. External circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act.

See OKLAHOMA UNIFORM JURY INSTRUCTIONS --CRIMINAL , § 4-63 at 144 (2d ed. 1996). We agree with the Committee that this language is preferable to an

(continued...)

Nevertheless, although the Oklahoma Committee's advice is sound and should be heeded, we conclude for several reasons that this instruction did not relieve the prosecution of its burden of proving beyond a reasonable doubt that Mr. Patton intended to kill Mrs. Kauer. Most importantly, as we have noted, the crucial principle of reasonable doubt is incorporated into the instruction. Under instruction 30, a design to effect death is not inferred if the jury has a reasonable doubt about the existence of such design.

We acknowledge that, if instruction 30 indicated that it was Mr. Patton's burden to establish reasonable doubt, then the instruction might well create a constitutionally invalid presumption analogous to those struck down in Sandstrom, Franklin, and Wiley. However, the instruction is silent as to which party has the burden as to reasonable doubt. As a result, we must examine the instructions as a whole to determine whether a reasonable juror could have read instruction number 30 to create an invalid presumption. Franklin, 471 U.S. at 315.

The other instructions given to the jury convince us that the OCCA's resolution of this issue was not unreasonable. As we have explained, Mr. Patton's defense focused on his contention that his cocaine intoxication prevented him from forming an intent to kill Mrs. Kauer. The jury was instructed that Mr. Patton was

_____

[4](...continued)
instruction based on OKLA. STAT. tit. 21 § 702.

-36-

entitled to that defense if he was "incapable of forming the specific criminal intent because [of] his intoxication," Rec. vol. III, at 530 (inst. 23), and that:

> [i]t is the burden of the State to prove beyond a reasonable doubt that the defendant formed the specific criminal intent of the crimes of, Murder In the First Degree and Burglary In The First Degree in the information. If you find that the State has failed to sustain that burden, by reason of the defendant['s] intoxication, then the defendant must be found not guilty of that particular crime.

Id. at 531 (instr. 24).

Moreover, other instructions also informed the jury that the prosecution had the burden of proving intent to kill beyond a reasonable doubt. The trial court's general instruction on the presumption of innocence informed the jury that "[t]he defendant must be found not guilty unless the State produces evidence which convinces you beyond a reasonable doubt of each element of the crime." Id. at 512 (instr. 5). The court's instruction on circumstantial evidence reminded the jury of that burden. See id. at 520 (instr. 13) (stating that "[i]n order to warrant conviction of a crime upon circumstantial evidence, each fact necessary to prove the guilt of the defendant must be established by the evidence beyond a reasonable doubt"). Similarly, the instruction on the elements of first-degree murder stated that the prosecution was required to prove each element, including the element that "the death was caused with malice aforethought," beyond a reasonable doubt. See id. at 533 (instr. 26). Finally, the court's instruction on returning a verdict

reminded the jury that "[i]f you find that the State has failed to prove each element of Murder In The First Degree beyond a reasonable doubt, you shall return a verdict of not guilty." Id. at 548 (instr. 41).

These instructions combined with the "reasonable doubt" limitation incorporated into instruction 30 itself, convince us that the OCCA did not unreasonably apply federal law in rejecting Mr. Patton's due process claim. We agree with the OCCA Committee for Preparation of Uniform Criminal Jury Instructions that the statement that "design to effect death is inferred from the fact of killing" presents the risk that a jury might discern a mandatory presumption of intent. However instruction 30's own "reasonable doubt" limitation, and the other instructions concerning the proof of intent, adequately clarify that the burden remained with the prosecution to prove intent beyond a reasonable doubt.[5] The instructions struck down in Sandstrom, Franklin, and Wiley differ significantly from the one at issue here in that they do not incorporate the concept of reasonable doubt. Accordingly, Mr. Patton is not entitled to relief on this claim.

_____

[5] Cf. Lockett v. Arn, 740 F.2d 407, 414 (6th Cir. 1984) (Jones, J., concurring) (noting the Ohio legislature's amendment to a statute that had suggested a presumption regarding the element of intent).

### G. Claim 6: Voluntary Intoxication Instruction

Next, Mr. Patton challenges the trial court's instruction that "homicide with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time." Rec. vol. III, at 536 (instr. 29). Mr. Patton contends that this instruction deprived him of the opportunity to present his defense of voluntary intoxication to the jury, thereby violating his federal due process right to a fair trial .

In adjudicating this claim, the OCCA considered Oklahoma law. See Patton, 973 P.2d at 288 (citing OKLA. STAT. TIT. 21 § 704 and OCCA decisions). However, as we have noted, the federal due process inquiry is controlled by state law. See McMillan, 477 U.S. at 85; Chapman, 302 F.3d at 1196. We therefore view the OCCA's decision on this issue as an application of the federal due process standard, and we consider whether that decision was unreasonable. We note that "[a]s a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law." Nguyen v. Reynolds, 131 F.3d 1340, 1357 (10th Cir. 1997) (internal quotation marks omitted).

In rejecting Mr. Patton's challenge to the voluntary manslaughter instruction, the OCCA first noted that this instruction mirrored the language of a state statute.

-39-

See OKLA. STAT. tit. 21 § 704.[6] Then, the court observed that the instruction accurately stated the rule of law that voluntary intoxication is not a complete defense to homicide but merely may reduce the crime to a lesser offense. See Patton, 973 P.2d at 288 (citing Crawford v. State, 840 P.2d 627, 638 (Okla. Crim. App. 1992)).

Like the OCCA, we see little merit in this argument. Although "[t]he right to present a defense is a fundamental element of due process of law," United States v. Bautista, 145 F.3d 1140, 1151 (10th Cir. 1998) (internal quotation marks omitted), Oklahoma courts may define the scope of the defense to an Oklahoma crime. See Tyler v. Nelson, 163 F.3d 1222, 1227 (10th Cir. 1999) (considering state law to determine whether the defendant was deprived of his due process rights through a failure to instruct on self-defense).

Here, the trial court properly instructed the jury on the elements of the voluntary intoxication defense, explaining that "[a] person is entitled to the defense of intoxication if that person was incapable of forming the specific criminal intent because [of] his intoxication," Rec. vol. III, at 529 (instr. 22), but adding that voluntary intoxication, standing alone, is not a defense, see id. at 536 (instr. no.

---

[6] OKLA. STAT. tit. 21 § 704 states that "[h]omicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time." See also OKLA. STAT. TIT. 21 § 153 ("No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition.").

29).  This is an accurate statement of Oklahoma law.  The OCCA has stated that "voluntary intoxication is not a defense to criminal culpability."  See Crawford, 840 P.2d at 638.  However, the court "recognize[s] an exception to this rule where the accused was so intoxicated that his mental abilities were totally overcome and it therefore became impossible for him to form criminal intent."  Id.  Thus, "[i]f voluntary intoxication is to be relied upon as an affirmative defense, the defendant must introduce sufficient evidence to raise a reasonable doubt as to his ability to form the requisite criminal intent."  Id.

Accordingly, Mr. Patton is not entitled to relief on this claim.

### H. Claim 7: Allegely Duplicative Evidence Supporting Aggravating Circumstances

As we have noted, the jury found the existence of four aggravating circumstances.  It concluded that: (1) Mr. Patton was previously convicted of a felony involving the use or threat of violence to the person; (2) the murder was especially heinous, atrocious, or cruel; (3) Mr. Patton committed the murder for the purpose of avoiding or preventing a lawful arrest or prosecution; and (4) Mr. Patton committed the murder while he was on parole for California felony convictions.

Mr. Patton now argues that aggravating circumstances (1) and (4) are duplicative.  He points to the prosecutors' reliance on the same California robbery

-41-

conviction to support both aggravators. The OCCA summarily rejected this argument. See Patton, 973 P.2d at 297 (stating that the argument "was rejected in Duckett v. State, 919 P.2d 7, 25-26 (Okla. Crim. App. 1995) [and that] [w]e do so again").

Mr. Patton has failed to establish that this alleged double-counting "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The Supreme Court has noted that it has "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting' theory that the Tenth Circuit advanced in [United States v. McCullah, 76 F.3d 1087, 1111 (10th Cir. 1996)]." Jones v. United States, 527 U.S. 373, 398 (1999).

Moreover, even if the double-counting theory were applicable here, see id. ("accepting, for the sake of argument, petitioner's 'double counting' theory"), Mr. Patton would still not be entitled to relief. Under our cases, one aggravating circumstance is improperly duplicative of another only if the first aggravator "necessarily subsumes" the other. Fields v. Gibson, 277 F.3d 1203, 1218-19 (10th Cir. 2002). The fact that two aggravating circumstances rely on some of the same evidence does not render them duplicative. See id. As we noted in Fields, "so long

as the aggravators are not duplicative, . . . we see no problem with . . . us[ing] the same evidence to support different aggravators." Id. at 1219-20.

Here, the first and fourth aggravating circumstance do not necessarily subsume one another and thus are not duplicative. In order to establish the first aggravating circumstance, the prosecution was required to prove that Mr. Patton was convicted of a certain kind of felony (a violent one). In order to establish the fourth aggravating circumstance, the prosecution was required to prove that Mr. Patton was on parole for a felony conviction at the time of the murder. The fact that the same conviction was used by the prosecution to prove both aggravators does not render the aggravators unconstitutionally duplicative.

Accordingly, Mr. Patton is not entitled to relief on this claim.

## I.  Claim 8:  Sentencing Evidence Not Proven Beyond a Reasonable Doubt

Next, Mr. Patton challenges his death sentence on the grounds that the prosecution relied upon evidence that was not proven beyond a reasonable doubt. The evidence in question involves three prior robberies. During the sentencing proceedings, the prosecution presented three witnesses who testified that, while working at various convenience stores in December 1994, they were robbed by an African-American man. The prosecution contended that this man was Mr. Patton.

However, in testimony before the jury, none of these witnesses identified Mr. Patton as the robber.

Mr. Patton invokes the Supreme Court's holding in Ring v. Arizona that "[i]f a state makes an increase in a defendant's authorized punishment contingent on the finding of fact, that fact, no matter how the State labels it–must be found by a jury beyond a reasonable doubt." 536 U.S. 584, 602 (2002). He maintains that the three witnesses' failure to identify him as the man who robbed the convenience stores demonstrates that his death sentence was based on facts not found by the required beyond-a-reasonable doubt standard.

As the state notes, the habeas corpus statute explicitly requires the petitioner to exhaust his claims in state court prior to proceeding in federal court. 28 U.S.C. § 2254(b); Clark v. Tansy, 13 F.3d 1407, 1409 (10th Cir. 1993). Mr. Patton did not present this claim to the Oklahoma state courts, and it is therefore unexhausted. [7]

---

[7] In his direct appeal, Mr. Patton did discuss the evidence supporting the state's contention that he had robbed three convenience stores in December 1994. See Patton, 973 P.2d at 294-95. However, he argued only that, in light of the convenience store employees' failure to identify him, his confession to those robberies was not sufficiently corroborated and therefore should not have been admitted. This contention was not sufficient to raise the Ring claim he now asserts. As we have noted:

> The exhaustion doctrine requires a state prisoner to fairly present his or her claims to the state courts before a federal court will examine them. Fair presentation of a prisoner's claim to the state courts means that the substance of the claim must be raised there. The prisoner's allegations and supporting evidence must offer the state courts a fair opportunity

(continued...)

-44-

Moreover, under Oklahoma law, the claim is now procedurally barred. See Hale v. Gibson, 227 F.3d 1298, 1328 (10th Cir. 2000) (noting that "Oklahoma bars collateral review of claims . . . that could have been raised on direct appeal but were not'). Although a procedural default may be overcome upon a showing of cause and prejudice or a fundamental miscarriage of justice, see Coleman v. Thompson, 501 U.S. 722, 750 (1991), Mr. Patton has not argued that these exceptions to procedural bar are applicable here.

In the interest of judicial economy, however, we briefly consider the merits of Mr. Patton's claim. See 28 U.S.C. § 2254(b)(2) stating that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); Romero v. Furlong, 215 F.3d 1107, 1111 (10th Cir. 2000) (allowing review of claim on merits, in spite of possibility of procedural bar, in interest of judicial economy). For three reasons, we conclude that the claim lacks merit.

First, as we have noted, Mr. Patton characterizes his claim as based upon Ring v. Arizona, 536 U.S. 584 (2002). However, in Schriro v. Summerlin, 124 S. Ct. 2519, 2526 (2004), the Supreme Court held that " Ring announced a new

_____

7(...continued)
        to apply controlling legal principles to the facts bearing upon his constitutional claim.

Thomas v. Gibson, 218 F.3d 1213, 1221 n.6 (10th Cir. 2000).

procedural rule that does not apply retroactively to cases already final on direct review." Ring was issued on June 24, 2002, after Mr. Patton's conviction and sentence had become final on direct review. Thus, Mr. Patton may not now challenge his sentence based upon a retroactive application of Ring.

Second, the evidence indicating that Mr. Patton committed these robberies is not nearly as tenuous as Mr. Patton suggests. During the sentencing proceedings, the prosecution presented testimony from an Oklahoma City police detective that Mr. Patton had confessed to committing the robberies described by the convenience store employees and that his confession supported the employees' accounts of those robberies.

Finally, Mr. Patton has failed to establish that, in returning a death sentence, the jury actually relied on a finding that Mr. Patton committed the prior robberies. In fact, the jury rejected the only aggravating circumstance to which the prior convictions were relevant: that Mr. Patton constituted a continuing threat to society. Thus, Mr. Patton has failed to establish that the challenged testimony "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (internal quotation marks omitted).

## J. Claim 9: Prosecutorial Misconduct

Finally, Mr. Patton argues that the prosecutors engaged in misconduct during jury selection, the guilt phase, and the sentencing phase. According to Mr. Patton, this misconduct deprived him of a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment.

The OCCA rejected Mr. Patton's claim of prosecutorial misconduct on the merits. See Patton, 973 P.2d at 301-02. The court noted that Mr. Patton had not objected at trial to most of the conduct about which he subsequently complained. None of that conduct, the court concluded, rose to the level of plain error. Similarly, none of the conduct to which Mr. Patton had objected was sufficiently egregious to warrant reversal of his conviction or sentence.

In rejecting Mr. Patton's claim, the court applied the standard for adjudicating allegations of prosecutorial misconduct set forth in its prior decisions. See id. at 302 (citing Duckett v. State, 919 P.2d 7, 19 (Okla. Crim. App. 1996) for the proposition that "[a]llegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such to deprive the defendant of a fair trial"). That standard is the same under federal law. See Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002). We therefore apply the deferential AEDPA standard of review, asking whether the OCCA unreasonably applied federal law. Miller v. Mullin, 354 F.3d 1288, 1293 (10th Cir. 2004).

-47-

When a defendant asserts claims of prosecutorial misconduct in a habeas petition, those claims are reviewed only for a violation of due process. See Darden v. Wainwright, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974) (internal quotation marks omitted). In order to be entitled to relief from a conviction or a sentence, Mr. Patton must establish that the prosecutors' conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id. at 643. This determination may be made only after "tak[ing] notice of all the surrounding circumstances, including the strength of the state's case." Coleman v. Brown, 802 F.2d 1227, 1237 (10th Cir. 1986).

However, when "prosecutorial misconduct directly affects a specific constitutional right such as the presumption of innocence or privilege against self-incrimination, a habeas petitioner need not establish that the entire trial was rendered unfair, but rather that the constitutional guarantee was so prejudiced that it effectively amounted to a denial of that right." Torres, 317 F.3d at 1158. Applying those standards, we consider the individual instances of alleged misconduct invoked by Mr. Patton.

**1. Comments concerning the presumption of innocence during jury selection and at both stages of the trial**.

When questioning a prospective juror during voir dire, one of the prosecutors asked:

> Do you understand that [the presumption of innocence] is only a presumption? It does not mean that he is innocent but he is to be presumed innocent unless and until the State of Oklahoma proves to you beyond all reasonable doubt all of the elements.

Tr. Trans. vol. III, at 10.

Mr. Patton's attorney objected on the grounds that to say "that does not meant that he is innocent" undermined the required presumption. After a bench conference, the judge then instructed the jury:

> All right. Ladies and gentlemen of the jury, as I told you, the Defendant is presumed to be innocent unless and until he is proven guilty beyond a reasonable doubt by evidence presented by the State.

Id. at 12.

The prosecutor then engaged in the following questioning of the prospective juror.

> [The prosecutor]:  Mr. Stover, if you went out into the jury room right now, if you had to vote guilty or not guilty, you would have to vote not guilty, is that correct?
>
> [Mr.] Stover:  Yes, ma'am.

| | |
|---|---|
| [The prosecutor]: | Because you've heard nothing. And what the law requires is that the state prove to you beyond a reasonable doubt each and every element. You understand that the burden of proof always rests with the State, never shifts to the Defendant? |
| [Mr.] Stover: | Yes, ma'am. |
| [The prosecutor]: | Would you agree to hold the State to the burden of proving beyond a reasonable doubt each and every element? |
| [Mr.] Stover: | Yes ma'am. |

Id. at 12-13.

During closing argument in the guilt phase, the prosecutor made a similar statement about the presumption of innocence:

> The Defendant is presumed innocent. He is presumed innocent until you consider all of the evidence in this case and you make the decision to strip that presumption away from him and leave him with what he is, which is guilty. What has to be proved to you before you can strip that cloak of innocence from him is proof beyond a reasonable doubt of each and every material element of the crime charged and we talked about that.
> The State of Oklahoma always has the burden of proof. But we have the burden of proof to show you beyond a reasonable doubt each and every element of the crimes charged.

Tr. Trans. vol. X, at 27-28. Mr. Patton did not object to this statement.

Then, in the closing argument in the sentencing phase, the prosecutor returned to the presumption of innocence:

-50-

> Mr. Patton is to be presumed innocent unless and until the State proves to you beyond a reasonable doubt one or more of the aggravating circumstances. And at that time you are authorized to strip that cloak away and punish this Defendant as he is worthy of being punished.

Tr. Trans. vol. XI, at 78. Mr. Patton did not object to this statement either.

We are troubled by the prosecutor's comment during voir dire. Denigrating the presumption of innocence by telling the jury that the presumption "does not mean that he is innocent " did have the potential to mislead the prospective jurors. Cf. Williams v. Abshire, 544 F. Supp. 315, 319 (E.D. Mich. 1982) (characterizing similar remarks as "open to criticism" but "not an error of constitutional magnitude"). However, the trial judge proceeded to correct the remark, repeatedly stating that the government had the burden of proving all of the elements beyond a reasonable doubt and that such proof was the only way that the presumption of innocence could be overcome. Accordingly, the OCCA reasonably concluded that this comment did not deprive Mr. Patton of his due process right to a fair trial.

As to the prosecutor's subsequent comments about the presumption of innocence, we note that, in making these comments, the prosecutor also reminded the jury that the state had the burden of proving its case beyond a reasonable doubt. In light of the prosecutor's acknowledgment of that burden, and in light of the entire record, the OCCA did not unreasonably apply federal law in ruling that these comments did not deprive Mr. Patton of a fair trial.

-51-

**2. Offering opinions during the guilt phase about Mr. Patton's guilt and the credibility of Dr. Smith.**

In the closing argument in the guilt phase, the prosecutor made certain comments about Mr. Patton's guilt. For example, she stated that "[i]t has been proven to you beyond a reasonable doubt each and every element of murder in the first degree and burglary in the first degree." Tr. Trans. vol. X, at 39.

The prosecutor also challenged the credibility of Mr. Patton's expert witness, Dr. Smith. For example, she stated that Dr. Smith "is exactly what he purports to be. He is a hired expert." Tr. Trans. vol. X, at 63. Because he was paid by the defense, the prosecutor argued, Dr. Smith was biased. See id. at 24, 63-65; 70-72, 75. Mr. Patton objected to the challenge to Dr. Smith's credibility but did not object to the prosecutor's alleged expression of her personal opinion as to Mr. Patton's guilt.

We conclude that the OCCA did not unreasonably apply federal law in rejecting this claim. Although a prosecutor may not vouch for the credibility of the state's witnesses, United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990), such impermissible vouching occurs only when "the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." Id. at 1498. Absent such personal vouching, a prosecutor

-52-

may fairly comment on the evidence.  United States v. Hartsfield, 976 F.2d 1349, 1354-55 (10th Cir. 1992).   Here, the prosecutor's statements about Mr. Patton's guilt and her challenge to Dr. Smith's testimony were based on evidence in the record, and she did not express her personal beliefs about these matters.  Moreover, in light all of the evidence against him, Mr. Patton has failed to establish that these comments were so prejudicial as to deprive him of a fair trial.

**3.  Guilt stage closing argument comments about the involvement of another person.**

Mr. Patton also challenges the prosecutors' statements in closing argument regarding evidence that a second person had entered the Kauer home with him.  Mr. Patton now contends that these statements improperly referred to evidence not in the record.  Mr. Patton did not object to these statements at trial.

The prosecutors' reference to this evidence began in the first closing argument during the guilt phase.  In that argument, the prosecutor stated that "there were two people that most likely went to that home because we have a shoe print and we have an unidentified third person's blood at the house."  Tr. Trans. vol. X, at 35.

In response, Mr. Patton's lawyer invoked Dr. Smith's testimony that Mr. Patton had an anti-social personality disorder.  In particular, he contended that, if a second person had been involved, Mr. Patton's personality disorder would lead him

to inform the police and shift blame to that person. The fact that he did not identify a second person thus indicated that the state's theory was incorrect. See id. at 48-49.

In rebuttal, the prosecutor contended that despite the alleged personality disorder, Mr. Patton might still have had a motive not to identify a second person involved in the crime. In particular, that second person "might be able to tell us what actually happened inside that house." Id. at 86-87. Thus, "the fact alone that [Mr. Patton] doesn't give up that person doesn't mean there wasn't another person there." Id. at 87.

We agree with the OCCA that the trial court did not plainly err in allowing this argument. We have stated that "[p]rosecutors have considerable latitude to respond to an argument made by opposing counsel." United States v. Hernandez-Muniz, 170 F.3d 1007, 1012 (10th Cir. 1999); see also United States v. Merryman, 630 F.2d 780, 789 (10th Cir. 1980) ("It is well settled that the attorney prosecuting the case on behalf of the government is authorized to respond to exculpatory arguments made by [the] defendant[ ] during closing arguments."). In general, "[t]he prosecutor . . . possesses reasonable latitude in drawing inferences from the record." Hooper v. Mullin, 314 F.3d 1162, 1172 (10th Cir. 2002). Here, the prosecutor's initial comments were based on evidence in the record regarding the involvement of a second person in the crime. The rebuttal statements suggested

reasonable inferences from the evidence in the record that could rebut Mr. Patton's argument. Accordingly, the OCCA did not unreasonably apply federal law in rejecting this claim.

**4. Sentencing stage arguments about steel-toed boots.**

Mr. Patton contends that the prosecutor engaged in misconduct by arguing that he had kicked Mrs. Kauer with steel-toed boots. Mr. Patton's attorney objected to this line of argument, but the trial court overruled the objection.

Upon review of the record, we agree with the state that there was sufficient evidence in the record to allow the prosecutor to advance this argument to the jury. In particular, the state presented expert testimony that Mrs. Kauer had suffered a subgallous hemorrhage to a bone in her head and that a kick from a steel-toed boot was capable of producing this injury. Mr. Patton informed the police that he was wearing boots at the time of the killing. The boots were admitted into evidence, and a photograph of them allowed the inference that they had steel toes.       See State's Ex. 81. Accordingly, the OCCA did not unreasonably apply federal law in rejecting this claim of prosecutorial misconduct.

**5. Sentencing stage arguments about Mr. Patton enjoying Mrs. Kauer's suffering.**

Although he did not object at trial, Mr. Patton now challenges the prosecutor's argument that he "discovered just how much enjoyment he could get out of" killing Mrs. Kauer. Tr. Trans. vol. XI, at 85. Here, the state's argument that the evidence allowed this inference is not particularly persuasive. The state points to no particular evidence that Mr. Patton's psychological makeup was such that he enjoyed others' suffering. The evidence to which the state does point—the violence of the attack and the fact that Mr. Patton did not kill Mrs. Kauer "in a quick and efficient manner," Aple's Br. at 71— does not directly support the prosecution's argument.

Nevertheless, even assuming that the prosecutor's argument here was improper, Mr. Patton's due process right to a fair trial was not violated. The jury had ample evidence upon which to base the death sentence, and, given the weight of this evidence, Mr. Patton has failed to demonstrate that this statement substantially influenced the jury. Accordingly, the OCCA did not unreasonably apply federal law in rejecting this claim.

**6. Sentencing stage arguments about a lack of evidence of Mr. Patton having been committed to Eastern State Hospital.**

Finally, Mr. Patton challenges the prosecutor's argument regarding one of the mitigating circumstances: that Mr. Patton suffered from a mental disorder. In

particular, Mr. Patton notes, the prosecutor argued that the jury had heard no evidence that Mr. Patton had ever been committed to a mental hospital. Although he did not object at trial, Mr. Patton now argues that the prosecutor mischaracterized the record.

We are not persuaded. As the state notes, the reference to a hospitalization for mental illness was ambiguous. Dr. Smith stated only that he had reviewed psychological reports from Eastern State Hospital, where Mr. Patton had been "examined." See Tr. Trans. vol. IX, at 117. Given that ambiguity, it was not improper for the prosecutor to point to a lack of evidence that Mr. Patton had been committed. Moreover, this comment certainly did not render Mr. Patton's trial fundamentally unfair.

Accordingly, the OCCA did not unreasonably apply federal law in rejecting this claim of prosecutorial misconduct, and Mr. Patton is not entitled to relief.

### III. CONCLUSION

One of Mr. Patton's claims gives us pause. The trial court's instruction that "[a] design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed" had the potential to mislead the jury as to the prosecution's burden of proof. Accordingly, we agree with the suggestion of the OCCA Committee for the Preparation of

-57-

Uniform Criminal Jury Instructions that trial judges should avoid that instruction. Nevertheless the trial court's other instructions here clearly informed the jury that the prosecution had the burden of proving all elements of first-degree murder, including the element of malice aforethought. Thus, the OCCA did not unreasonably apply federal law in rejecting Mr. Patton's claim. None of Mr. Patton's other arguments are persuasive.

Accordingly, we AFFIRM the district court's decision denying Mr. Patton's 28 U.S.C. § 2254 petition.

No. 03-6140, Patton v. Mullin

**BRISCOE,** Circuit Judge, concurring:

I agree with the majority that Patton has failed to establish that he is entitled to federal habeas relief. I write separately, however, because I disagree with the majority's conclusion that the first-degree malice aforethought murder instruction given by the trial court did not relieve the prosecution of its burden of proving intent beyond a reasonable doubt. As set forth in greater detail below, I conclude the instruction did, in fact, impermissibly relieve the prosecution of its burden, but that, given the strength of the prosecution's evidence of Patton's intent, the resulting error was harmless.

It is well established that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). In Sandstrom v. Montana, 442 U.S. 510, 512 (1979), the Supreme Court was asked to decide whether this principle was violated by a jury instruction stating "the law presumes that a person intends the ordinary consequences of his voluntary acts." The Court determined, as a threshold matter, that the answer to the question hinged "upon the way in which a reasonable juror could have interpreted the instruction." Id. at 514. The Court then concluded that a reasonable juror "could easily have viewed [the] instruction as mandatory," since the jury was "not told that they had a choice, or that they might infer that

conclusion [i.e., that a person intends the ordinary consequences of his voluntary acts] . . . ." Id. at 515.  More specifically, the Court suggested that a reasonable juror might have understood that the presumption was either conclusive (that is, the instruction was "an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption"), or else that it was "a direction to find intent upon proof of the defendant's voluntary actions (and their 'ordinary' consequences), unless the defendant proved the contrary by some quantum of proof which may well have been considerably greater than 'some' evidence." Id. at 517. Thus, the Court concluded the instruction could have effectively shifted to a criminal defendant the burden of proof on the issue of intent.  Id. at 518-21.

The Supreme Court subsequently revisited the Winship principles in Francis v. Franklin, 471 U.S. 307 (1985), a federal habeas case brought by a Georgia state prisoner convicted of murder and sentenced to death.  At issue in Francis were two jury instructions that involved presumptions regarding intent.  The first stated: "[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted." Id. at 309.  The second stated: "[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted." Id.

In analyzing these two instructions, the Court noted that the critical question was whether they "create[d] . . . mandatory presumption[s], . . . or merely . . .

-2-

permissive inference[s] . . . ." Id. at 314. "A mandatory presumption," the Court explained, "instructs the jury that it must infer the presumed fact if the State proves certain predicate facts," and will violate the Due Process Clause if it "relieve[s] the State of the burden of persuasion on an element of an offense." Id. In contrast, the Court stated, "[a] permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." Id. "A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." Id. Further, a permissive inference "violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." Id. at 314-15.

To determine which category a particular instruction falls into, the Court explained, the "[a]nalysis must focus initially on the specific language challenged . . . ." Id. at 315. However, the Court emphasized, that does not end the inquiry:

> If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption.

Id.

Applying this analytical framework to the two instructions at issue before it, the Court noted that both instructions were "cast in the language of command" because they used the phrases "are presumed" and "is presumed." Id. at 316. Thus, the Court concluded, the instructions could have been viewed by a reasonable juror as mandatory, and in turn would have undermined the juror's responsibility of finding the ultimate facts beyond a reasonable doubt. Id. Although the Court acknowledged that both instructions informed the jury the presumptions were rebuttable, id. at 316-17, it concluded that a reasonable juror could have understood this language as indicating "that the defendant bore an affirmative burden of persuasion once the State proved the underlying act giving rise to the presumption." Id. at 318. Thus, the Court concluded the instructions, standing alone, "undeniably created an unconstitutional burden-shifting presumption with respect to the element of intent." Id. Finally, the Court concluded that the jury charge "taken as a whole" did not "explain[] the proper allocation of burdens with sufficient clarity that any ambiguity in the particular language challenged could not have been understood by a reasonable juror as shifting the burden of persuasion." Id. at 318-19. In particular, the Court concluded that "general instructions as to the prosecution's burden [of persuasion] and the defendant's presumption of innocence d[id] not dissipate the error in the challenged portion of the instructions." Id. at 320.

In Patton's case, the state trial court, as part of its first-stage jury instructions pertaining to the first-degree malice aforethought murder charge, provided the jury with the following instruction, taken directly from Okla. Stat. tit. 21, § 702: "A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed." State Court Record, Vol. III at 537. Patton challenged the constitutionality of this instruction in his direct appeal. The OCCA concluded there was no merit to Patton's challenge:

> [Patton] also finds error in Instruction No. 30. This instruction is taken from 21 O.S.1991, § 702, which provides:
> > A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed.
>
> (O.R.537). This type of instruction and whether it absolves the State from proving each and every element of the offense beyond a reasonable doubt has been previously discussed by this Court. See Davis v. State, 665 P.2d 1186, 1195 (Okl.Cr. 1983); Assadollah v. State, 632 P.2d 1215, 1221 (Okl.Cr. 1981) (Brett, P.J. concurs in part/dissents in part). In Hall v. State, 635 P.2d 618, 620-21 (Okl.Cr. 1981), cert. denied, 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982) this Court found no error in giving an instruction based on section 702 as the instructions as a whole fully informed the jury of the State's burden of proof on the question of the defendant's design to effect death. This Court further noted that the jury was also instructed that all elements of the offense must be proven beyond a reasonable doubt and that a premeditated design to effect death must be found in order to return a conviction for murder. In the present case, the jury was instructed on the elements of first degree murder, that each element must be proven by the State beyond a reasonable doubt, and that "malice aforethought" means "a deliberate intent to take away the life of a human being." The concerns raised in previous cases are not present here as the instructions clearly placed the burden of proof on the question of intent with the State, and not with the defense.

Patton v. State, 973 P.2d 270, 288-89 (Okla. Crim. App. 1998) ("Patton I").

Because Patton has challenged the OCCA's ruling in his federal habeas petition,

the question we now face is whether the OCCA's decision is contrary to, or an

unreasonable application of, Sandstrom and Francis.

As outlined in Sandstrom and Francis, the threshold question is how a

reasonable jury could have interpreted the challenged instruction.[1]  In my view, the

instruction at issue created a mandatory presumption, rather than a permissive

inference.  More specifically, because the challenged instruction stated that "[a]

design to effect death is inferred from the fact of killing," a reasonable juror clearly

could have interpreted this language as mandatory.[2]  See Wiley v. Rayl, 767 F.2d

679, 681 (10th Cir. 1985) (reaching similar conclusion with respect to similar

instruction employed in Kansas case).  In other words, the use of the phrase "is

---

[1] The OCCA did not expressly address this question in      Patton I .  However, due to
the fact that the OCCA reviewed the instructions as a whole, it can arguably be
inferred that the OCCA concluded the instruction at issue created a mandatory
presumption, rather than a permissive inference.

[2] The district court in this case concluded that the language of the challenged
instruction merely created a permissive inference.  ROA, Vol. 1, Doc. 21 at 55.
In reaching this conclusion, the district court relied on this court's decision in
Davis v. Maynard  , 869 F.2d 1401, 1405 (10th Cir. 1989).  The district court's
reliance on  Davis , however, was misplaced because the challenged instruction in
Davis employed the phrase "may be inferred," rather than the phrase "is inferred."
Id.

-6-

inferred" could have led a reasonable juror to conclude that he or she did not have a choice about whether to infer a design to effect death.[3]

The next question is what effect, if any, the final phrase of the instruction ("unless the circumstances raise a reasonable doubt whether such design existed") likely would have had on the jury. Although this language arguably created a rebuttable presumption, the instruction was silent with respect to which party carried the burden of rebutting the presumption. Thus, as in <u>Francis</u>, a reasonable juror could have concluded it was the defendant, rather than the State, who bore the burden of rebutting the presumption created by the fact of the killing, i.e., by demonstrating that "the circumstances raise[d] a reasonable doubt whether" a design to effect death "existed."

The remaining question under the <u>Sandstrom/Francis</u> framework is whether the instructions as a whole "explain[ed] the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption." <u>Francis</u>, 471 U.S. at 315. The trial court expressly instructed the jury that Patton was presumed innocent of the charges against him. State Court Record, Vol. III, at 512. Further, several of the trial court's

---

[3] As noted in Patton's opening appellate brief, Oklahoma's Uniform Instruction committee has advised against using an instruction such as the one given by the trial court in this case due to concerns that it "'may prove confusing to the jurors because it suggests a conclusion that the jury is required to draw where they find that the defendant killed the deceased . . . .'" Aplt. Br. at 27 (quoting Oklahoma Uniform Jury Instructions - CR-63, page 149, Attachment B).

instructions to the jury expressly indicated that the prosecution bore the burden of proving beyond a reasonable doubt every element of the first degree murder charge. Id. at 512 (Inst. No. 5), 516 (Inst. No. 9), 531 (Inst. No. 24); 533 (Inst. No. 26); 548 (Inst. No. 41). Apparently, it was these instructions which the OCCA relied upon in concluding that "the instructions [as a whole] clearly placed the burden of proof on the question of intent with the State, and not with the defense." Patton I, 973 P.2d at 289.

The problem with the OCCA's conclusion in this regard is that it is directly contrary to the Supreme Court's decision in Francis. In concluding that the general instructions utilized by the trial court were sufficient to cure any error, the OCCA relied on three of its own cases in which similar issues had been raised and addressed. See id. Notably, however, all three of those cases predated Francis, and thus were decided without the benefit of the Court's discussion of why such general instructions are insufficient to cure an instructional error that shifts the burden of proof to a defendant. In Francis, the Court held that "general instructions on the State's burden of persuasion and the defendant's presumption of innocence are not rhetorically inconsistent with a conclusive or burden-shifting presumption, because the jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied . . . ." 471 U.S. at 319 (internal quotations omitted). Thus,

-8-

contrary to the conclusion reached by the OCCA in Patton's direct appeal, the

Court held that such general instructions "do not dissipate the error in the

challenged" instruction.[4]  Id. at 320.

Having concluded that the challenged instruction impermissibly shifted the

burden of persuasion to Patton and thus violated his constitutional rights (and that

the OCCA's resolution of this issue was contrary to, or an unreasonable application

of, Franklin), there remains the question of whether the error was harmless.  See

Carella v. California, 491 U.S. 263, 266 (1989) (noting that a Sandstrom/Franklin

error is subject to harmless error review); Rose v. Clark, 478 U.S. 570 (1986)

(same); Buehl v. Vaughn, 166 F.3d 163, 177 (3d Cir. 1999) (same); cf. Neder v.

United States, 527 U.S. 1, 7-8 (1999) (holding that omission of element from the

judge's charge to the jury is subject to harmless error review under Rule 52(a)).

Because the OCCA did not reach this issue, it is reviewed de novo by this court

---

[4]  At the time of the trial in this case, Oklahoma law provided that "[w]henever the existence of a presumed fact against the accused establishes guilt or is an element of the offense . . . and is submitted to the jury, the judge shall give an instruction explaining that the jury may regard the basic facts as sufficient evidence of the presumed fact but is not required to do so" and "that its existence must be proved beyond a reasonable doubt."  Okla. Stat. tit. 12, § 2304(C). Unfortunately, however, the trial court did not provide such an instruction to the jury in Patton's case, and Patton's defense counsel did not make a request for such an instruction.  See Patton I, 973 P.2d at 289 (addressing and rejecting Patton's argument that his defense counsel was ineffective for not objecting to the trial court's failure to give such an instruction).  Had such an instruction been given, it would arguably have been sufficient to cure the error created by the challenged instruction.

under the harmless error standard announced in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38 (1993).  <u>See</u> <u>Herrera v. LeMaster</u>, 301 F.3d 1192, 1195 (10th Cir. 2002) (en banc).  Under the <u>Brecht</u> standard, the question is whether the error had substantial and injurious effect or influence in determining the jury's verdict, i.e., whether the error resulted in "actual prejudice."  If the evidence is so evenly balanced that we are in grave doubt about whether the error meets this standard, we must hold that the error is not harmless.  <u>See</u> <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436-37 (1995).

A close examination of the trial transcript in this case indicates that the evidence of Patton's intent to kill Charlene Kauer was extremely strong, if not overwhelming.  The nature and extent of Charlene Kauer's injuries, viewed alone, strongly suggests that Patton intended to kill her.  Further, although Patton repeatedly asserts he was under the influence of cocaine at the time of the killing and was unable to form the intent to kill, that defense was far from convincing.  In particular, Patton's involuntary intoxication defense was effectively undermined not only by the confusing testimony of his expert witness, but more importantly by his own lack of credibility (as demonstrated by the constantly-varying stories he gave to the police following his arrest) and his actions after the killing (i.e., cleaning up, disposing of his bloody clothing, returning to work and acting as if nothing had happened).  Thus, the evidence on the issue of intent was far from

-10-

"evenly divided," and I am not persuaded that the instructional error at issue here had a substantial and injurious effect or influence in determining the jury's verdict. Accordingly, I conclude Patton is not entitled to federal habeas relief on this claim.